

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CV–15–854

|  |  |
|---|---|
| | **OPINION DELIVERED** MARCH 9, 2016 |
| RAYMOND VAIL and SAMANTHIA SEE | |
| APPELLANTS | APPEAL FROM THE RANDOLPH COUNTY CIRCUIT COURT, [NO. JV-2014-37] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES and S.S., MINOR CHILD | HONORABLE KEVIN N. KING, JUDGE |
| APPELLEES | AFFIRMED |

**ROBERT J. GLADWIN, Chief Judge**

In this termination-of-parental-rights case, both parents, in separate briefs, appeal the Randolph County Circuit Court's order of August 11, 2015, terminating their parental rights and granting to appellee Arkansas Department of Human Services (DHS) the power to consent to adoption. Appellants Raymond Vail and Samanthia See both argue that termination of their parental rights was not in the child's best interest. Raymond also contends that the trial court erred in determining that DHS proved a statutory ground for terminating his parental rights. We affirm.

I.     *Statement of Facts and Procedural History*

A petition for emergency custody and dependency-neglect was filed by DHS on April 7, 2014, alleging that Samanthia and Raymond were the parents of S.S., born April 7, 2013; Samanthia had custody; and Raymond was the legal/putative father. The attached affidavit of the DHS caseworker stated that a protective-services case had been opened on

June 26, 2013, when Samanthia left S.S. alone for three hours and failed a drug screen for THC by diluting the specimen with hot water. The case was closed on November 7, 2013, after services, including parenting classes, had been provided. An emergency occurred on April 3, 2014, when Samanthia admitted to not feeding S.S. until after 2:00 p.m., S.S. had a severe diaper rash that had gone untreated, and Samanthia had her roommate, Daniel Honeycutt, caring for S.S. Honeycutt had threatened suicide days prior, and Samanthia had refused to take a drug screen for DHS. A seventy-two-hour hold was taken on S.S. due to the maltreatment and risk of serious harm.

A probable-cause order was filed on April 8, 2014, finding probable cause that the emergency conditions that necessitated removal of custody from Samanthia continued and that S.S. should remain in DHS custody. DHS was to develop an appropriate case plan and provide services. The parents were ordered to view "The Clock is Ticking" video; attend and complete parenting classes; submit to random drug screens, a drug-and-alcohol assessment, and a psychological evaluation; obtain and maintain sufficient income to support the family and safe, clean, and stable housing; permit DHS access to their home; regularly attend visits; notify DHS if transportation was needed; and keep DHS informed of correct telephone numbers and addresses. The order also stated that Raymond should establish paternity.

An adjudication order was filed on May 20, 2014, and the circuit court found that DHS had been involved with the family since May 28, 2013, and services, including

SLIP OPINION

parenting classes, home visits, and random drug screens had been provided. These services did not prevent removal because an emergency developed on April 3, 2014, as outlined above. The circuit court found by a preponderance of the evidence that S.S. was dependent-neglected due to Samanthia's environmental and medical neglect. DHS remained the custodian, and the goal of the case was reunification with a parent. The concurrent plan was adoption/guardianship/permanent custody. All prior orders remained in place.

A review order was filed on September 30, 2014, and custody remained with DHS. Raymond was adjudicated to be the father of S.S., and the goal of reunification remained. The circuit court found that Samanthia had been compliant in completing parenting classes, viewing the video, and completing the psychological and drug-and-alcohol assessments and outpatient substance-abuse counseling. She had attended counseling at Mid South, submitted to random drug screens, attended weekly supervised visitations, and maintained a home. However, Samanthia was not compliant in that she tested positive for THC when she performed the drug-and-alcohol assessment; she missed a visit on August 21, 2014; and she did not have sufficient income. The circuit court noted that DHS reported that Samanthia was inconsistent during visits in her concern for S.S., her interaction with S.S., and her affection for S.S.

The circuit court found that Raymond was compliant in completing parenting classes, viewing the video, submitting to drug-and-alcohol and psychological assessments,

attending visitation, maintaining income and a home, and submitting to random drug screens. However, Raymond tested positive for THC and opiates on August 12, 2014, and on September 11, 2014, and he had not returned his home-study packet. He was often late for visits, and he had trouble keeping track of visitation days and times. Neither parent was ordered to pay child support.

A permanency-planning order was filed on March 31, 2015, and the circuit court found that return of custody to the parents was contrary to the welfare of S.S, and continuation of custody in DHS was in the child's best interest. The circuit court authorized a plan for adoption with DHS filing a petition for termination of parental rights because (1) S.S. was not being cared for by a relative, and termination was in her best interest; (2) DHS had provided appropriate services; and (3) the permanent goal should be a plan for adoption. Accordingly, the circuit court appointed counsel for Raymond. A home study and drug-and-alcohol assessment on Raymond were admitted in evidence. The circuit court found that, while Samanthia had been partially compliant with the case plan and was continuing to seek disability income after being denied twice, she had not been compliant in that she tested positive for THC at the drug-and-alcohol assessment and for opiates on January 7, 2015. She had missed one visit on August 21, 2014, and she did not have sufficient income. The circuit court specifically noted concerns about Samanthia's credibility. Regarding Raymond, the circuit court found compliance and noncompliance as set forth above and further found that the home-study packet, which was finally submitted in January 2015 due to his not being able to provide a current address, was denied.

DHS filed a petition for termination of parental rights on April 17, 2015, and alleged that (1) S.S. had been out of the custody of the parents for twelve months, and despite meaningful effort by DHS to rehabilitate the parents and correct the conditions which caused removal, those conditions had not been remedied, citing Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(*a*) (Repl. 2015); (2) subsequent to the filing of the original petition for dependency–neglect, other factors or issues arose which demonstrated that placement of S.S. in the parents' custody would be contrary to her health, safety, or welfare and that despite the offer of appropriate family services, the parents had manifested the incapacity or indifference to remedy the subsequent issues, citing Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(*a*); and (3) the parents had subjected S.S. to aggravated circumstances, citing Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(*a*). DHS alleged that, due to her tender age, S.S. was adoptable and that there was potential harm due to the parents' lack of sufficient income and their instability with respect to relationships and employment.

At the termination hearing held on June 23, 2015, Raymond testified that he and Samanthia had never been married to each other and had not lived together. He claimed that S.S. had been in his home almost every weekend and every day he had off work until she was removed by DHS and placed in foster care. He claimed that S.S. was placed in foster care because he stopped going to Samanthia's house and keeping it clean. He admitted to having contact with Samanthia, as he had been to her house on the day prior to the hearing. He explained that he had a prescription for opiates when he tested positive for that, but admitted that he had failed the drug screen for THC, which was his fault. He said

that he did not know where he got the marijuana. He said that he had three jobs and had trouble getting his home-study packet returned to DHS. He denied being late for visits and denied having trouble remembering what day his visits were scheduled. He admitted that he did not keep a calendar even though he was shown how to keep one. Since the case began, he had moved three times and had two girlfriends. He said he was currently dating Anna, his fiancée. He admitted that he also had sex with Samanthia twice since the case began. His jobs were at a sawmill and Larry's Pizza, and he had a weekend job cutting timber. He admitted that his income was not sufficient to cover his bills on a monthly basis. He claimed that the only thing he had failed to do was the home study. He further claimed that he did not know of Samanthia's drug problem before DHS became involved.

Samanthia testified that she is S.S.'s mother and that S.S. was almost a year old when she was placed in foster care by DHS. She said,

> [T]hey took her because my house is trash. They said she was drinking on a spoiled bottle, and I didn't feed her until two o'clock that afternoon, she had a severe diaper rash, which it actually was a yeast infection. And it wasn't that bad because I was treating it.

She claimed that she only had problems with keeping a job. She claimed that S.S. had a yeast infection from antibiotics she had been taking for an ear infection. Samanthia said S.S. was dirty that day because she had been teaching S.S. to walk outside in the dirt. She did not bathe S.S. before her nap because she planned on taking S.S. back outside. She admitted having used marijuana around the time S.S. was removed from her care, but denied having used opiates in January 2014. She surmised that someone may have slipped her some pills,

as she had been hanging around some bad people, including Raymond. She claimed that Raymond had two fiancées during the case. She admitted having had several different boyfriends since the case started and explained that it was because she was looking for something "long term." She said that she had visited S.S. on Thursdays and that DHS had talked to her about how she needed to focus on S.S. during her visits. She wanted DHS to help her find a job so she could be reunited with S.S. Her plan was to leave S.S. with a friend while she worked. She also thought that if she could get her driver's license, a car, and a job in Jonesboro, she could take S.S. to her aunt's daycare there. She said that she was applying for disability based on her borderline-personality disorder, which developed over many years of being abused. She said that she sometimes took her medication as she was supposed to, but most of the time she did not.

Allison Starr testified that she was the family-service worker for DHS and was assigned to S.S.'s case from April 2014 until January 2015. She helped develop both of the case plans. She said that Raymond and Samanthia had done everything in the case plans. However, she testified that DHS's recommendation was to terminate the parental rights of both parents and change S.S.'s goal to adoption.

She said that Raymond had not been able to do an unsupervised visit or extend his visits throughout the entire case. She admitted that DHS and the ad litem determined by agreement whether to extend visitation. She said, "He's been unable to get a hold of most of the time. There's been times that we've tried to extend the visits and we have not been

able to get a hold of him." She said that even after repeated suggestions that he keep his telephone with him so that he could be reached, most of the time Raymond would not answer his telephone. She said that if S.S. were to go back home and an emergency occurred while she was with a caretaker and Raymond was at work, there would be a concern that Raymond would not be reachable. She also said that Raymond did not have a plan for how he would care for S.S. if she were in his home. She claimed that Raymond told her that he worked from "sunup to sundown," that he would never cut Samanthia out of his daughter's life, and that Samanthia could care for her. She said that Raymond had not always been on time for his visits with S.S. and that she helped him develop a calendar for visitation. She said that when she stopped making a calendar for him, he showed up on the wrong days. She said that he would have to know the child's schedule for school, doctor appointments, and different things. She also said that Raymond had requested a home study, but DHS was not able to give him one until paternity had been established. That was done in June, but the study was not done until January because Raymond had different addresses. He had lived in five different places since the case had begun.

She said that Raymond had failed drug tests for THC and opiates, but later provided verification of a prescription for the opiates. She admitted that she was not concerned about the opiates, but she was concerned about the marijuana. She said that marijuana can stay in your system from thirty to forty-five days, and the tests were administered to Raymond thirty days apart. She said that it was a positive sign that Raymond had not failed a drug screen for the last nine months. She stated that Raymond stayed fairly consistent with his

visitation, that he had missed four out of forty-eight visits, and he was late a total of five times. She said that she had observed him being appropriate on visits with S.S. She also said he had one fiancée at the beginning of the case, he then went "back and forth" with Samanthia, and he now had a current fiancée. Therefore, he had been involved with three women over the last fourteen months. She said that Raymond's income was not sufficient and that Samanthia did not have a job. She said that she found it interesting that both Samanthia and Raymond tested positive for the same illegal drugs.

Ms. Starr also testified that she was not aware of any factors that would prolong or prohibit an adoption in this case. She said that both parents had insufficient income to support S.S. and that both had instabilities in their lives. She said one family member interested in adopting S.S. had requested a home study.

Ava Lou Holt testified that she was Samanthia's landlord, had been for ten months, and that Samanthia's home was clean. She said that Samanthia was gullible and impressionable, but she had a good heart. She had witnessed Samanthia maintain a normal household, clean, and cook. She said that she had taken Samanthia to apply for jobs and that Samanthia was trying hard to get one.

At the conclusion of the hearing, the circuit court granted DHS's petition to terminate parental rights of both parents. The circuit court's order was filed on August 11, 2015. Appellants filed separate notices of appeal in a timely manner, and this appeal followed.

II.      *Standard of Review*

We review termination–of–parental–rights cases de novo. *Mitchell v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 715, 430 S.W.3d 851. At least one statutory ground must exist, in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341; *Dunn v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 34, ___ S.W.3d ___. Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Anderson v. Douglas*, 310 Ark. 633, 839 S.W.2d 196 (1992). The appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *J.T. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Yarborough v. Ark. Dep't of Human Servs.*, 96 Ark. App. 247, 240 S.W.3d 626 (2006).

III.      *Termination of Samanthia's Parental Rights*

Samanthia argues that termination of her parental rights was not in S.S.'s best interest. She specifically targets the circuit court's finding that S.S. would be subject to potential harm if returned to her custody. She does not challenge the circuit court's finding that there was at least one ground supported by sufficient evidence or that S.S. was adoptable. However, she contends that reversal is still proper on the potential-harm factor as it is a

component of the best-interest finding and must be proved separate and apart from any statutory ground or adoptability. She maintains that there was insufficient evidence to support the circuit court's finding of potential harm. She cites *Conn v. Arkansas Department of Human Services*, 79 Ark. App. 195, 85 S.W.3d 558 (2002), where this court reversed the termination of the father's parental rights because there was no clear and convincing evidence that termination was in the child's best interest. We noted that no evidence was presented at the termination hearing at all, and the termination was based solely on a stipulation concerning the earlier termination of parental rights to the juvenile's sibling. *Id.* at 198, 85 S.W.3d at 560. Because only one of the two requirements of the statute was proved, the circuit court's decision to terminate parental rights was deemed clearly erroneous. *Id.*

Samanthia also cites *Strickland v. Arkansas Department of Human Services*, 103 Ark. App. 193, 287 S.W.3d 633 (2008), where this court reversed the termination of the mother's parental rights, which was predicated on the mother's numerous moves during the pendency of the case. The *Strickland* court held as follows:

> Appellant always maintained some type of housing, and DHS presented no clear and convincing evidence that any of her residences were unsafe or inappropriate. DHS cites the moves as evidence of an unusually peripatetic or unstable personality, but there are logical explanations for many of the moves. Moreover, they equally connote a continual striving by appellant to maintain suitable housing despite her circumstances. We believe the termination decision is too important to rest on this factor, given the entirety of the evidence in this case. As late as August 2007, the court lauded appellant's progress and predicted imminent reunification. Appellant is unquestionably devoted to her children and visited them faithfully throughout the case. Her completion of three sets of parenting classes is a testament to her

SLIP OPINION

determination to abide by the case plan and court orders. And, while it appears she may have missed some of JS's doctor's appointments during this two-year case, the record reveals some confusion as to whether she received notification of all appointments.

Further, there was no clear and convincing evidence that appellant's limited cognitive abilities or her possible depression, which was not shown to be anything other than situational, adversely affected her ability to parent JS and CS. Nor was there clear and convincing evidence that appellant's meager income rendered her unfit. Appellant testified that her disability payments and food stamps covered what few expenses she had, with money left over. DHS witness Jennifer Harper testified that appellant could possibly support herself and the children on that income. It is also noteworthy that, when appellant lost her vehicle after separating from Mr. Garcia–Lopez, she was able to establish a transportation support system that no DHS witness could seriously fault. Jennifer Harper testified that appellant's obligation to acquire stable transportation did not necessarily require ownership of a car.

*Strickland*, 103 Ark. App. at 200, 287 S.W.3d at 639.

Samanthia argues that her primary issues, as articulated by DHS's caseworker, were related to income, unstable relationships, and visitation concerns that boiled down to her utilizing her telephone at times during visits. She contends that the evidence demonstrated that she had successfully maintained a stable and clean home for ten months prior to the termination hearing, had faithfully visited S.S., had completed the case plan, and had not engaged in any relationship for several months prior to the hearing. She argues that none of that evidence was challenged, and all of it belies the circuit court's finding that S.S. would be subject to potential harm if returned to her custody. She cites *Benedict v. Arkansas Department of Human Services*, 96 Ark. App. 395, 398, 242 S.W.3d 305, 308 (2006), for the proposition that, while there is still reason to believe there can be a positive, nurturing

parent-child relationship, the law favors preservation, not severance, of natural familial bonds.

The State contends that a de novo review supports the circuit court's decision to terminate Samanthia's parental rights. We agree. Appellate review here is limited to whether the circuit court's best-interest finding was clearly erroneous. The best-interest finding must be based on a consideration of two factors—the likelihood that, if parental rights are terminated, the juvenile will be adopted, and the potential harm caused by continuing contact with the parent. Ark. Code Ann. § 9-27-341(b)(3)(A). The court was not required to find that actual harm would result or to affirmatively identify a potential harm. *McFarland v. Ark. Dep't of Human Servs.*, 91 Ark. App. 323, 210 S.W.3d 143 (2005). Furthermore, the Arkansas Supreme Court has directed that the potential-harm analysis be conducted in broad terms. *Bearden v. Ark. Dep't of Human Servs.*, 344 Ark. 317, 42 S.W.3d 397 (2001).

DHS opened a protective-services case in June 2013 because Samanthia had left S.S. unsupervised for three hours. Samanthia also tested positive for THC after she had tried to dilute the test specimen with hot water. She was provided with services, including parenting classes, referral for counseling through a contract provider, home visits, and random drug screens. The case remained open for five months, then it was closed. Five months later, there was a report to DHS that Samanthia was providing S.S. inadequate food and supervision. S.S. was reportedly in a dark bedroom with the door shut, crying and drinking

from an old bottle. S.S. had a full diaper and a severe diaper rash. Samanthia admitted that S.S. had not eaten that day, and it was 2:00 p.m. When the caseworker contacted Samanthia, she became irrational and erratic, screaming at the caseworker and threatening a lawsuit. DHS assumed immediate emergency custody and the current case began, resulting in an adjudication of dependency–neglect and an ultimate termination of parental rights.

Even though Samanthia was mostly case-plan compliant, her completion of the case plan is not determinative. Whether her completion achieved the intended result of making her capable of caring for S.S. is what mattered. *Wright v. Ark. Dep't of Human Servs.*, 83 Ark. App. 1, 115 S.W.3d 332 (2003). Here, even after nearly two years of DHS services, she was not employed and was not ready to care for S.S. She had not obtained disability benefits, and she had no stable means of supporting herself and S.S. The caseworker testified that Samanthia had learned little in spite of the services. She discussed Samanthia's visits with S.S. and her need to be redirected to focus on S.S. Further, it was necessary to implement a plan for Samanthia to obtain approval to bring extra people to visits with S.S., and Samanthia needed a plan that forbade telephone calls and texts during her visits with S.S. Accordingly, the circuit court's best-interest finding was not clearly erroneous.

IV.     *Termination of Raymond's Parental Rights*

Raymond contends that the circuit court committed reversible error by terminating his parental rights. He argues that none of the four statutory grounds alleged by DHS were

proved by clear and convincing evidence. He also contends that the circuit court erred in finding that it was in S.S.'s best interest to terminate his parental rights.

The third ground for terminating Raymond's parental rights relied on Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(*a*), in finding that, subsequent to the filing of the original petition, other factors or issues arose which demonstrate that placement of S.S. in the parent's custody would be contrary to S.S.'s health, safety, or welfare and that despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors. The circuit court found that the parents had failed to comply with their case plans, both failing drug screens, and both having issues keeping up with their visitation times and places. However, Raymond contends that a review of the record shows that the circuit court found him to be compliant with the case plan. The record also shows that drugs were not a concern with Raymond, according to the caseworker's testimony. Finally, Raymond contends that his visitation record was positive. Thus, he argues that DHS did not produce clear and convincing evidence as to this ground.

Raymond maintains that the circuit court seemed to articulate a burden of proof that is not supported by Arkansas law. He refers to the remarks made during the circuit court's ruling from the bench and contends that juvenile courts are supposed to protect the best interest of the child. He asks if average people could not successfully traverse dependency-neglect court, what hope do those who are below average have?

Raymond also contends that the circuit court erred in finding that it was in S.S.'s best interest to terminate his parental rights. The circuit court's best-interest finding was premised on the likelihood that S.S. would be adopted and the potential harm to her health and safety caused by returning S.S. to her parents' custody. The circuit court relied on the caseworker's testimony, which the court found to be credible, and the parents' failure to complete their case plans, engaging in multiple relationships during the course of the case, and failure to show they can adequately provide for S.S. Raymond claims that the caseworker's testimony was that he was compliant with the case plan, had demonstrated appropriate parenting skills during visitations, was consistently employed, and had been drug free for nine months. He claims that he could find no case law to support the circuit court's decision that three girlfriends over the course of a year equates to instability or potential harm, and he argues that there was scant evidence that he lacked the financial means to care for his child. Assuming there was evidence that he was too poor to provide for his child, that, by itself, should not be a potential harm that would substantiate a best-interest finding in a termination-of-parental-rights proceeding. *Davis v. Smith*, 266 Ark. 112, 583 S.W.2d 37 (1979).

Termination of parental rights requires clear and convincing evidence that two elements exist. Ark. Code Ann. § 9-27-341(b)(3). First, termination must be in the child's best interest; second, at least one of nine statutory grounds must exist. Here, the circuit court found that both conditions existed. Among other things, the circuit court terminated Raymond's parental rights under section 9-27-341(b)(3)(B)(vii)(*a*), which provides that

rights can be terminated if, subsequent to the filing of the original petition for dependency-neglect, other factors or issues had arisen demonstrating that placement of the child with the parents was contrary to the child's health, safety or welfare, and that despite the offer of appropriate family services, the parent had manifested the incapacity or indifference to remedying those issues.

After the case had begun, Raymond twice tested positive for illegal drugs. This in itself was a subsequent factor. *Dodd v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 64, ___ S.W.3d ___. Raymond was also difficult to keep track of throughout the case, was difficult to contact via telephone or otherwise, and moved so often that a home study could not be done until January 2015, which was then denied. Even though Raymond worked several jobs, his expenses were more than his income, and his daughter was not living with him at that point. Raymond's financial instability was something learned subsequent to the filing of the petition for dependency-neglect. The circuit court was also rightfully concerned with Raymond's demonstrated instability in relationships with the opposite sex, maintaining some sort of on-again off-again relationship with Samanthia and entering two marriage engagements with other women over the course of one year. The State contends that he was somewhat compliant with visitation, as he had issues with tardiness and inaccessibility, which led to DHS never extending him more visits or unsupervised visitation.

As is the case with Samanthia, Raymond's compliance with the case plan did not achieve the result of making him capable of caring for S.S. *Wright, supra.* After a year of

17

DHS-provided services, the circuit court still was not confident that Raymond had demonstrated the capacity to remedy these factors that arose subsequent to the child's removal. As only one ground is necessary to terminate parental rights, and clear and convincing evidence supports the "subsequent factors ground," we affirm the circuit court's termination of Raymond's parental rights and do not discuss the other statutory grounds raised by Raymond.

Regarding clear and convincing evidence that termination was in the child's best interest, taking into consideration the likelihood that the child will be adopted and the potential harm that may occur from returning the child to the custody of the parents, the evidence must be viewed in a forward-looking manner and considered in broad terms. *Dowdy v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 180, 314 S.W.3d 722. Raymond argues that there was insufficient evidence of potential harm and no evidence that he posed a danger to his child. However, the financial, relationship, and housing instability and uncertainty discussed above support the circuit court's finding of potential harm. *See Singleton v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 455, 468 S.W.3d 809. Continuing use of illegal drugs, as shown by Raymond's positive drug tests, also by itself shows potential harm. *Allen v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 288, 384 S.W.3d 7. Moreover, after a year into the case, Raymond still had not demonstrated that he was capable of providing S.S. with a safe and appropriate family home. In light of this factor and the circuit court's voiced concern over Raymond's inability to articulate a clear plan for S.S.'s care or his own income and housing situation, no clear error has been committed.



Affirmed.

VIRDEN and GRUBER, JJ., agree.

*Bristow & Richardson, P.L.L.C.*, by: *Benjamin W. Bristow*, for appellee Raymond Vail.

*Leah Lanford*, Arkansas Public Defender Commission, for appellant Samanthia See.

*Jerald A. Sharum*, County Legal Operations, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.