BART F. VIRDEN, Judge
In this termination-of-parental-rights case, both parents, appellants Robin and Philip Hopfner, separately appeal the Madison County Circuit Court's order terminating *78 their parental rights to JH.[1] The Hopfners argue that the circuit court erred in its determination because termination of their parental rights was not in the child's best interest. We affirm.
I. Relevant Facts
On April 3, 2017, the Arkansas Department of Human Services ("Department") filed a petition for emergency custody and dependency-neglect regarding JH (10/16/14), NP (03/26/02), and JP (08/01/05).[2] In the affidavit to the petition, the Department stated that on March 16, 2017, it received a report of child maltreatment and neglect, and family service worker Miranda Hall went to the Hopfners' home where she performed a drug screen on Philip, who tested positive for methamphetamine, amphetamines, MDMA, and THC. Philip did not appear to be intoxicated at that time. Robin failed to produce a sample and dropped the test cup in the toilet. Hall advised the Hopfners to remain drug free and to clean the home, and she told them that she would be back in a week to check in. When Hall returned, the home had been cleaned, and Philip tested negative for all substances. Robin again dropped her cup in the toilet but produced a clean sample later, and Hall suspected sample tampering. Hall advised the Hopfners that she would return in a week.
On March 27, Hall received word that Robin had become suicidal, and she went to the Hopfners' home where she found Robin distraught. Philip had driven away with JH without placing the child in a car seat. A marijuana plant was found in the home, and Philip was later arrested for manufacturing drugs and child endangerment. On March 29, 2017, Hall returned to the home and talked to Robin, who admitted using methamphetamine and that she used someone else's urine for the drug test. Robin stated that she knew Philip grew marijuana in the home and that she believed he had also used someone else's urine for the drug test. Robin explained that she had instructed JP and NP to lie to the Department. Hall obtained text messages between Robin and Philip and the two older children regarding methamphetamine addiction, selling drugs, leaving the children alone for long periods of time, and telling them what to say to the Department. The family had been involved with the Department since 2006; however, no true findings of abuse or neglect had ever been made against the Hopfners.
The circuit court entered an emergency order on April 3, 2017. In the order, the circuit court found that the children were dependent-neglected and that it was contrary to their welfare to return them to Robin's custody due to her drug use and pending criminal charges.[3] Philip was incarcerated at the time of removal. On April 6, the circuit court entered a probable-cause order finding that due to both Philip's and Robin's drug use, Philip's current incarceration on felony drug charges *79 and parole violation, and Robin's instability, it was in the children's best interest to remain in Department custody. Philip was allowed to have visitation, but Robin was ordered to have no contact with the children. The Department was ordered to provide services, including drug-and-alcohol assessment and counseling, and the Hopfners were ordered to remain sober, attend counseling, submit to assessments, obtain stable employment, maintain a stable home, demonstrate the ability to protect their children from harm, resolve all criminal issues, and remain in contact with the Department and their attorneys. The juveniles were placed with their maternal aunt and uncle, Jennifer and Timothy Williams.
On June 1, the circuit court entered an adjudication order in which the it found by clear and convincing evidence that JH, JP, and NP were dependent-neglected. Specifically, the court found that the Hopfners used illegal drugs and failed to ensure the children's safety. The court found that "mother and father exposed the children to a lifestyle of drugs," and the two older children had been diagnosed with PTSD. The court allowed the Hopfners to have visitation in a therapeutic setting with the approval of the children's counselors. The Hopfners were ordered to watch "The Clock is Ticking" video and obey all orders of the court. The goal of the case was reunification.
On August 16, 2017, Philip filed a motion for an emergency hearing regarding visitation with JH. On September 22, the court held a review hearing, and the pursuant order was entered on September 26. In the order, the circuit court noted that Philip had produced a certificate of completion of parenting classes and that Robin had completed four hours of parenting classes. The circuit court addressed Philip's August motion regarding visitation, finding that "Robin and Philip Hopfner placed these children in a living hell (see adjudication order). These 3 children are all suffering from post-traumatic stress disorder !" The court found that the Department had "acted to the detriment of the kids" by allowing JH to go on unauthorized, unsupervised visits with the paternal grandparent and "various family members under the guise of 'provisional' placement or other such 'policy' ". The circuit court found that Robin and Philip had complied with some of the its orders but found that custody could not be returned to the Hopfners because of the extreme trauma from which the children had not yet recovered and that neither Robin nor Philip had demonstrated the ability to safely parent the children. The circuit court ordered that neither parent was allowed visitation with the children.
On December 21, 2017, the circuit court entered a review order in which it found that the Department's custody should continue even though the Hopfners had complied with all the court orders and the case plan. The court found that the Hopfners had made some progress toward alleviating the causes of the children's removal but that the children were severely traumatized, and the Hopfners had not demonstrated that they could safely parent the children. The court found that the children were doing well in the Williamses' care.
On March 22, 2018, the Department filed a petition for termination of the Hopfners' parental rights, citing three statutory grounds: (1) that the children had been out of the custody of the parents for twelve months and despite Department efforts to rehabilitate parents and correct the conditions, the conditions that caused removal have not been remedied; (2) that other factors arising subsequent to the filing of the original petition demonstrated that the parents have manifested an incapacity or *80 indifference to remedying the subsequent issues; (3) that the children had been subjected to aggravated circumstances, and there was little likelihood of reunification.
The Department also alleged that it was in the best interest of the children to terminate the Hopfners' parental rights. The Department asserted that the children were highly adoptable and that there was great potential for harm if the children were returned to the Hopfners' custody. Specifically, the Department contended that the children were emotionally unable to attend family therapy sessions and that their mental health would suffer if they were returned to their parents' custody. The Department also noted that JH expressed strong hostility toward the Hopfners' recently born child.
The permanency-planning order was entered on March 27, 2018. In the order, the court found that the parents had partially complied with the case plan and orders of the court; however, they had not made significant progress toward the goal of the case, they were not diligently working toward reunification, and the children could not return to their parents' home within three months of the permanency-planning hearing. The circuit court found that the Hopfners had not demonstrated the ability to safely parent the children and protect them from harm and that return to their custody was contrary to the children's welfare. The circuit court authorized a plan for adoption and found that termination was in the children's best interest. Counseling between NP and JP and Robin was ordered to cease, but the court allowed family counseling to continue between JH and the Hopfners, as recommended by JH's therapist.
On June 1 and June 27, the court held the two-part termination hearing. At the hearing, police officer Jeremy Riley testified that on March 18, 2018, he arrested Philip for third-degree domestic battery and terroristic threatening. Officer Riley explained that he responded to Robin's 911 call and that Robin told him that when she asked Philip to get up and take care of the new baby, he elbowed her in the back and told her she was dead. Robin refused to fill out and sign the witness-statement form, and the charges were nolle prossed.
Abby Hill, JH's counselor, testified that JH has PTSD symptoms, night terrors, aggressive behavior, and he was very traumatized and ducked his head when there was loud noise. Hill tied JH's trauma symptoms to the Hopfners' home environment, which included exposure to domestic violence and neglect. She explained that JH had made progress in therapy but that he still exhibited many symptoms of PTSD and could not be returned to the Hopfners' custody at that time. The counselor testified that one of the goals of JH's therapy was for the biological parents to participate in therapy and that if therapy with Robin were to end suddenly it would negatively impact JH's progress. Hill stated, "I do recommend today that those sessions continue. Regardless of what happens, I think currently, you know, my goal is to help heal JH and I think part of that is that it would continue with mom 'cause I think he is making progress by seeing her and going through that therapeutically." Hill stated that JH's sessions with Philip ended in March when he was arrested for domestic battery. She explained that before the cessation of therapy with Philip, JH had been anxious during sessions and his anxiety symptoms had improved when Philip stopped attending. Hill stated that she could not see a marked improvement "until it was just JH and Mom together." Hill opined that therapy with Philip should not be reinstated at that time, but she stated that "down the road I think it might be beneficial."
*81 A second hearing was held on July 27, 2018. At that hearing, Carrie Nickles, JP and NP's therapist, testified that the girls were doing well and flourishing in foster care. They had expressed no interest in returning home, and Nickles stated that she believed it would be detrimental to the children if they were returned to the custody of the Hopfners. Both girls have PTSD, nightmares, and flashbacks. Nickles stated that the three siblings are very bonded to each other, and it would be detrimental to all three children if they were separated.
Robin testified at the hearing that she had wanted the girls to remain in the Williamses' custody; however, she believed that she could have a relationship with JH at that time. Robin opined that she did not "feel it's fair to him to make decisions based on the girls." Robin explained that JP and NP would be turning eighteen soon-in two years and five years-and they were going to have their own lives but that JH was young and she believed that it would be in his best interest to return to their custody. Robin asserted that she and Philip had made lasting changes. Robin downplayed her 911 call and Philip's arrest, explaining that the domestic-violence incident was due to sleep deprivation and stress related to having a new baby.
Philip also testified at the hearing. He stated that he and Robin were doing well, and they had changed. Philip expressed a desire to have a relationship with JH as well as JP and NP.
Bryn Bagwell, the CASA volunteer, testified that the children are very bonded to each other and that they are happy in their aunt and uncle's home. Bagwell praised Robin's progress and maternal instincts, and she opined that one day the family would be reunited but that it would not be any time soon. Bagwell stated that it was not time to reunite the family and that she feared the kids would regress if placed in the Hopfners' custody. Bagwell explained that the children were unable to trust the Hopfners to make good decisions about their care, and she believed that the children were "all ready to not have to think about this and be more settled in their lives. And they want to be together. They are a support for each other." Specifically as to JH, Bagwell opined that since February 2018, JH was more aggressive and had to be restrained from harming himself after counseling with Robin. She recommended termination of the Hopfners' parental rights.
Jennifer Williams, the custodial aunt, testified that the children are extremely bonded to one another and that she and her husband wanted to adopt all three children. She stated that if the therapist recommended contact between the Hopfners and the children at some point, then she would agree to allow contact.
Whitney Widner, the family service worker, testified that the children ask her "when is this going to be over" every time they see her. Widner also opined that she believed that the children would regress if returned to the Hopfners' custody. Widner stated that if the therapist recommended that the children continue visitation after the adoption, then the Department supported that decision but that it was in the best interest of the children to terminate parental rights.
The circuit court noted the Hopfners' compliance with the case plan and that they had "changed their lives around. They have made huge changes." The court stated that NP and JP were older and able to verbally articulate their reasons for not wanting to be with the Hopfners, but that JH was too young to do so and acted out instead. In closing, the court stated, "I think that once the girls continue in therapies, *82 they'll be able to have contact with all three of their parents, hopefully. And so I have no doubt that in my mind, none whatsoever, that the rights of the parents should be terminated, that it's in the best interest of these children." The court then stated, "I am going to leave it up to the good discretion of the aunt and uncle about-work with the therapist when the kids reach a point, and that may be different for each child as to contact with the biological families." The court stated, "in light of the fact that the visits have gone so poorly-or JH's behaviors are so escalating after the family counseling with JH and mom, it's my understanding that the therapist-I had left it up to the therapist at the permanency planning hearing as to mom's therapeutic sessions with JH[.]" The therapist was sworn in, and she stated that "I would hope that he'd be able to continue in therapy and family therapy with Jennifer, the aunt." The court noted that when the aunt and uncle adopted the children, the Hopfners would become the aunt and uncle and JH would "still have that family connection." The court noted that it was not ordering no contact with the Hopfners.
The termination order was entered on September 11, 2018. In the order, the circuit court found that three statutory grounds supported termination: the aggravated-circumstances ground, the twelve-month-failure-to-remedy ground, and the subsequent-factors ground. The court found that Robin conceded to termination of her parental rights to JP and NP, but that the Hopfners contested the termination as to JH. The circuit court also found that termination was in the children's best interest and determined that it was likely that the children would be adopted, noting that the Williamses were interested in adopting the three siblings. The circuit court found there was potential for harm if the children are returned to the Hopfners' custody. The court determined that due to the Hopfners' former lifestyle the children have PTSD, and they expressed fear about being returned to their parents' custody. The circuit court also noted that over a year after the case was opened, there was a domestic disturbance between Robin and Philip, which was exactly the kind of ordeal from which the children were still recovering and would be traumatized by if they were returned to the Hopfners' custody. The circuit court found that (1) though the Hopfners mostly complied with the case plan, they were never able to demonstrate an ability to safely parent the children or keep them from harm; (2) the children were all very bonded to each other, and it would be counter to the best interest of the children to separate them; (3) the Department made reasonable efforts to provide services. Robin and Philip each timely filed a separate notice of appeal.
II. Standard of Review
We review termination-of-parental-rights cases de novo. Mitchell v. Ark. Dep't of Human Servs. , 2013 Ark. App. 715, 430 S.W.3d 851. At least one statutory ground must exist, in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341 (Supp. 2017); Dunn v. Ark. Dep't of Human Servs. , 2016 Ark. App. 34, 480 S.W.3d 186. Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. Vail v. Ark. Dep't of Human Servs. , 2016 Ark. App. 150, at 10, 486 S.W.3d 229, 234. The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. Id. A finding is clearly erroneous when, *83 although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Yarborough v. Ark. Dep't of Human Servs. , 96 Ark. App. 247, 240 S.W.3d 626 (2006). Credibility determinations are left to the fact-finder, here the circuit court. Schaible v. Ark. Dep't of Human Servs. , 2014 Ark. App. 541, at 8, 444 S.W.3d 366, 371.
III. Discussion
The Hopfners do not challenge the statutory grounds for termination found by the circuit court. They contend only that the circuit court's best-interest determination must be reversed because there is insufficient evidence supporting the potential-harm finding, namely that the court resorted to "mere speculation" in making the finding, that it treated the three children as an "amorphous group," and that because the children's permanency was not at risk, there was insufficient evidence that termination was necessary. The Hopfners' arguments are without merit, and we affirm.
In making a "best-interest" determination, the circuit court is required to consider two factors: (1) the likelihood that the child will be adopted and (2) the potential of harm to the child if custody is returned to a parent. Miller v. Ark. Dep't of Human Servs. , 2016 Ark. App. 239, 492 S.W.3d 113. The potential-harm analysis is to be conducted in broad terms. Sharks v. Ark. Dep't of Human Servs. , 2016 Ark. App. 435, 502 S.W.3d 569. Credibility determinations are for the circuit court to make, not this court. Bridges v. Ark. Dep't of Human Servs. , 2019 Ark. App. 50, at 8, 571 S.W.3d 506.
When making the decision whether to terminate parental rights, the circuit court has a duty to look at the case as a whole and how the parent has discharged his or her parental duties, the substantial risk of serious harm the parent imposes, and whether the parent is unfit. Black v. Ark. Dep't of Human Services , 2018 Ark. App. 518, at 8, 565 S.W.3d 518, 523. Partial or even full completion of the case plan is not determinative of the outcome of the termination proceeding. Wright v. Ark. Dep't of Human Servs. , 83 Ark. App. 1, 115 S.W.3d 332 (2003). What matters is whether completion of the case plan achieved the intended result of making a parent capable of caring for the child; mere compliance with the orders of the court and the Department is not sufficient if the roots of the parent's deficiencies are not remedied. Lee v. Ark. Dep't of Human Servs. , 102 Ark. App. 337, 345-46, 285 S.W.3d 277, 282-83 (2008). The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3) (Supp. 2013).
Both Robin and Philip assert that the circuit court ignored their progress such as their full compliance with the case plan, their ability to keep their newborn safe, and their successful family counseling; thus, the circuit court's potential-harm finding amounted to "mere speculation." The Hopfners direct our attention to termination cases in which we reversed the circuit court's best-interest determination. In Ivers v. Arkansas Department of Human Services , 98 Ark. App. 57, 250 S.W.3d 279 (2007), the father was getting inpatient drug treatment and had taken responsibility for his addiction, and we held that it was mere speculation for the circuit court to find that his past would necessarily *84 dictate the future, especially considering his general compliance with the case plan. In Cranford v. Arkansas Department of Human Servs. , 2011 Ark. App. 211, at 10, 378 S.W.3d 851, 857, this court held that the circuit court's best-interest finding was clearly erroneous where there was no evidence of either parent physically abusing or harming the child or being a threat to do so in the future.
Both Ivers and Cranford are distinguishable from the instant case. Here, JP, NP, and JH had been diagnosed with PTSD from the domestic violence they were exposed to and from the severe neglect they experienced in their parents' custody. Neither the father in Ivers nor the parents in Cranford had ever subjected the children to an abusive or traumatic household, whereas the Hopfners had exposed the children to domestic abuse a "drug lifestyle," and "a living hell." Moreover, sufficient evidence supports the circuit court's potential-harm finding. The children's counselors, the CASA volunteer, the Department, and both Robin and Philip testified at the hearing that none of the children were ready to be returned to the Hopfners' custody because of the lingering anxiety-related issues stemming from the trauma they suffered while in their parents' care. The CASA volunteer and the children's counselors also noted that the three children were bonded to each other. Philip characterizes the circuit court's acknowledgment of this strong, meaningful bond between the siblings and its reliance on this bond as support for the potential-harm finding as erroneously viewing the children as an "amorphous group." In fact, the court relied on testimony from several witnesses that the children were extremely bonded due to the trauma they had suffered, and to separate them would be detrimental to their emotional health.
Also, Philip and Robin mischaracterize their "full compliance" with the case plan and cite this court to their ability to safely parent their newborn as support for their position; however, as recently as March 2018-nearly a year after removal-the police were called to the home, and Philip was arrested for third-degree domestic battery and terroristic threatening. The Hopfners attempted to downplay this incident, and Robin explained that the stress of having a newborn caused the incident; however, the court noted that exposure to domestic violence had partly caused the children's trauma, and the domestic-violence issue had not been resolved, despite almost a year of Department services and the fact that there was only one child in the home.
Philip and Robin also cite to the testimony of JH's counselor that continued therapy between JH and his parents would benefit him and that reunification of the family was assured. The Hopfners cited only the testimony that supports their argument. In fact, Hill testified that though she recommended continued counseling between JH and Robin, JH had not shown "marked improvement" until the counseling with Philip had ceased. Hill did not recommend that therapy with Philip be reinstated, and she opined that "down the road" therapy "might" be beneficial. Moreover, the CASA report submitted at the termination hearing set forth the following:
Since February 2018, J is not handling post-counseling sessions well. J is more aggressive (hitting and screaming) and has nightmares after sessions with his mother. J is head banging and wakes up crying after his sessions with his mother. In the evenings after sessions, J has had to be restrained to prevent from hurting himself and others. J is not responding well to therapy sessions with *85 mom and CASA believes it would be in his best interest for these to be stopped.
The Hopfners ask us to reweigh the evidence. It is well settled that we will not reweigh the evidence on appeal, and credibility determinations are left to the circuit court. Newman v. Ark. Dep't of Human Servs. , 2016 Ark. App. 207, 489 S.W.3d 186. Furthermore, the Hopfners are incorrect that the court ignored their progress. The circuit court found that the Hopfners had complied with many of the court orders such as obtaining psychological evaluations, attending counseling, maintaining sobriety, and obtaining stable housing and employment. The court acknowledged the CASA volunteer's testimony that "mom's an amazing lady and she's just awed by what mom has done and Mr. Hopfner[.]" We find no clear error in the circuit court's determination that terminating the Hopfners' parental rights is in the children's best interest.
Philip separately argues that that their situation is comparable to one of the parents in Lively v. Arkansas Department of Human Services , 2015 Ark. App. 131, 456 S.W.3d 383 in which we reversed the termination of the father's parental rights because the children had a permanent home with their mother, their relationship with their paternal grandparents was a stable influence, and a no-contact order with their father had not been considered by the court. Philip also cites Cranford , supra , where permanency was not at issue because the child had a stable home in relative placement. Both of these cases are distinguishable from the instant case. Here, unlike Lively and Cranford , JH, NP, and JP all suffered extreme dependency-neglect that left them with PTSD and other trauma-related issues. Moreover, the circuit court noted that it was not placing a no-contact order on the parents for the pendency of the appeal. Lastly, the circuit court explained why it did not choose a less restrictive option than termination:
With respect to return home today of NP and JP and JH would not be in the children's best interest. Therapist, CASA, Ms. Widner all testified that it would be detrimental to return the girls to mom and Mr. Hopfner. I find that is clear and convincing. I find it to be very credible. I'd also note that by keeping this case open this long to give mom and dad the time they've been given has caused emotional distress, and permanency is the goal for children and what's in their best interest. I find that the Department, by clear and convincing evidence, has shown that the harm to placing these children, the two older ones and little JH, with mom and Mr. Hopfner, would be too great. And not only with respect to that, I find that the aunt hit the nail on the head where she said that these kids love all three of their parents. These children are stuck, and they need to move forward. And I believe that they'll reach a point, hopefully, the children, where they've healed enough with the trauma and stress that they will be able to have contact with Mr. Phillips, Mr. Hopfner, and Ms. Hopfner, but it's not today, and it's not gonna be any time soon.
For the reasons stated above, we affirm.
Affirmed.
Gruber, C.J., and Brown, J., agree.

It is unclear whether Robin is appealing the termination of her parental rights to NP and JP because although she refers to the termination of her parental right to the "children" in her brief at certain times, she limits her argument to the termination of her parental rights to JH. Because Robin offers no argument as to NP and JP, we hold that she has abandoned any argument as to the older children, and we do not address whether the circuit court erred in terminating Robin's parental rights to NP and JP. See Phillips v. Ark. Dep't of Human Servs. , 2018 Ark. App. 463, 560 S.W.3d 499.

Robin is the biological mother of all three children, and Philip is the biological father of JH and stepfather to NP and JP. NP and JP's father was incarcerated at the time of removal and is not a party to this appeal.

In the amended order, the circuit court also added Dwayne Phillips as NP and JP's father.