2011 Ark. App. 211

Tiffany CRANFORD and Christopher Cranford, Appellants

v.

ARKANSAS DEPARTMENT OF HUMAN SERVICES and Minor Child, Appellees.

No. CA 10–1193.

Court of Appeals of Arkansas.

March 16, 2011.

Rehearing Denied April 20, 2011.

Leah Beth Lanford, Little Rock, Janet Lawrence, Conway, for appellant.

Melissa Bristow Richardson, Jonesboro, Elisabeth McGee, Little Rock, for appellee.

JOHN B. ROBBINS, Judge.

Tiffany Cranford and Christopher Cranford have appealed separately from an order entered in Sebastian County Circuit Court on August 31, 2010, which terminated both of their parental rights to their son, S.C., who was born on June 4, 2005. On appeal, both Tiffany and Christopher challenge the sufficiency of the evidence to support the grounds for termination. Because the trial court clearly erred in finding that termination of parental rights was in the child's best interest as to either parent, we reverse and remand on both appeals.

An order forever terminating parental rights must be based on clear and convincing evidence that termination is in the child's best interest. Ark.Code Ann. § 9–27–341(b)(3)(A) (Repl.2009). Factors to consider in determining best interest include the likelihood of adoption and potential harm caused by returning the child to the custody of the parent. *Id.* Additionally, the petitioner must prove at least one statutory ground for termination by clear and convincing evidence. Ark. Code Ann. § 9–27–341(b)(3)(B) (Repl. 2009). The purpose of terminating a parent's rights to his or her child is to provide permanency in the child's life where returning the juvenile to the family home is contrary to the child's health, safety, or welfare, and it appears that a return to the family home cannot be accomplished in a reasonable period of time as viewed from the juvenile's perspective. Ark.Code Ann. § 9–27–341(a)(3) (Repl.2009). A heavy burden is placed on the party seeking termination because termination of parental rights is an extreme remedy in derogation of the natural rights of the parents. *Grant v. Arkansas Dep't of Human Servs.,* 2010 Ark. App. 636, 378 S.W.3d 227. We do not reverse a termination order unless the trial court's findings were clearly erroneous. *Meriweather v. Arkansas Dep't of Health & Human Servs.,* 98 Ark.App. 328, 255 S.W.3d 505 (2007).

This case began on May 20, 2009, when appellee Arkansas Department of Human Services (DHS) took a seventy-two-hour hold on the minor child. On that day, S.C. and Tiffany were passengers in a truck being driven by Christopher. The truck was involved in an accident, and upon responding to the accident the Fort Smith police discovered that both Christopher and Tiffany had been drinking. Both parents were arrested. Christopher was charged with child endangerment, DWI, and felony fleeing the scene of an accident. Tiffany was charged with child endanger-

ment. The trial court entered an order for emergency DHS custody on May 26, 2009, and S.C. has remained out of the custody of his parents since then. S.C. was placed in the custody of his maternal grandfather and his wife, who live in Fort Smith.

The trial court entered an order adjudicating S.C. dependent/neglected on September 17, 2009. At that time, the goal of the case was reunification with the parents. The trial court issued the following orders for both parents:

The [parents] shall attend and complete parenting classes; attend and complete a psychological evaluation and comply with the recommendations resulting from such; attend and complete a drug and alcohol assessment and comply with the recommendations resulting from such; visit the juvenile on a regular basis; obtain and maintain housing that is safe, stable and appropriate; obtain and maintain employment/income sufficient to support the family; and obtain transportation that is safe, stable and appropriate; clear up pending criminal charges, and comply with NA/AA meetings three (3) times per week.

The trial court entered an amended adjudication order on October 28, 2009, which contained identical requirements for each parent. A review order entered on January 28, 2010, provided that the case goal continued to be reunification.

On July 19, 2010, the trial court entered a permanency planning order changing the case goal to termination of parental rights and adoption, with the concurrent goal of a guardianship. DHS filed a petition to terminate the parental rights of both Tiffany and Christopher on July 22, 2010. A termination hearing was held on August 23, 2010.

The trial court's order terminating both parents' parental rights was entered on August 31, 2010. In the order, the trial court found by clear and convincing evidence that termination of parental rights was in S.C.'s best interest. In addition, the trial court found clear and convincing evidence of each of the following two statutory grounds under Ark.Code Ann. § 9–27–341(b)(3)(B):

(i)(a) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

. . . .

(ii)(a) The juvenile has lived outside the home of the parent for a period of twelve (12) months, and the parent has willfully failed to provide significant material support in accordance with the parent's means or to maintain meaningful contact with the juvenile.

The trial court found that DHS had made reasonable efforts to work toward the case-plan goal, but that neither parent had complied with the court's orders, case plan, and services offered by DHS. Specifically, the trial court found that Tiffany did not have a stable home or job, lacked reliable transportation, and had only visited her son four times since he had been taken into DHS custody. As to Christopher, the trial court found that he had been in prison since March 2010 for his criminal actions involving his son, that his earliest release date was October 1, 2010, and that he would be on parole until 2013. The trial court further found that Christopher did not have a stable home or job and had no driver's license.

Brent Hesler, the DHS caseworker for S.C.'s case, testified at the termination

hearing. Mr. Hesler testified that he assumed the case from another caseworker in February 2010. Mr. Hesler indicated that S.C. is doing very well in the custody of his maternal grandparents.

Mr. Hesler testified that Tiffany did attend parenting classes as ordered, but only recently obtained a psychological assessment and that the results were not yet available. He further stated that Tiffany has not been stable in her housing, and has not had any employment or transportation since he has been involved in the case. Mr. Hesler stated that Tiffany has visited S.C. only four times during the fifteen months since S.C. was removed from her custody. He stated that some of the visits were missed because Tiffany had moved out of state.

Mr. Hesler testified that Christopher has been incarcerated since March 2010, and that his earliest parole release date was October 1, 2010, about six weeks from the date of the termination hearing. Mr. Hesler testified that Christopher did submit to a psychological evaluation, and among other things the psychological evaluation report recommended that Christopher participate in drug-and-alcohol-treatment programs. Mr. Hesler further testified that Christopher had completed several programs during his incarceration. As for visitation, Mr. Hesler said that it was denied in June 2009 because Christopher had a positive drug screen. Mr. Hesler testified that subsequent visits were difficult to arrange because Christopher had moved to Little Rock. Evidently the only two visits that were accomplished between Christopher and S.C. came in the beginning and middle of January 2010. Mr. Hesler indicated that the monthly home visits by a Little Rock caseworker found Christopher's apartment to be clean, and that Christopher presented well during the visits.

Mr. Hesler testified that S.C. is definitely an adoptable child. He gave the opinion that it was in S.C.'s best interest that parental rights be terminated and that S.C. be made available for adoption by relatives.

Tiffany testified that at the time S.C. was taken from her and Christopher's custody, they were living with her father and stepmother, in whose custody S.C. was subsequently placed and remains. Tiffany indicated that after Christopher is released from prison they plan to divorce. Tiffany moved to Oklahoma and lived with her mother for six months. After that she moved to Kansas for seven or eight months and lived with her boyfriend, whom she said she plans to marry. Tiffany returned to Arkansas and completed an inpatient rehabilitation and parenting program. Tiffany stated that she currently lives in a Fort Smith shelter for abused women. She stated that she has been there for the past week as a result of being raped by a friend's estranged husband while she was staying at her friend's apartment.

Tiffany testified that she only visited S.C. four times during the pendency of this case because of the distance involved. However, she stated that she maintained regular telephone contact with DHS to check on how S.C. was doing. Tiffany acknowledged that she has not worked at all since her son was removed from her custody, but stated that she is currently looking for a job. Tiffany further said that she does not have a car and uses public transportation.

Tiffany testified that she would like more time to secure employment and recover from her recent traumatic event, and asked the court not to terminate her parental rights. Alternatively, Tiffany asked

the court to grant a guardianship to her father and stepmother.

¶7 Christopher testified that, sometime in the summer of 2009 after S.C. was removed from his custody, he was involved in an altercation resulting in an assault charge for which he spent a month in jail. Christopher is presently incarcerated on charges of child endangerment, leaving the scene of an accident, and DWI second offense, and he expects to be released on October 1, 2010. Upon being released he will be paroled to the home of his mother and stepfather, where he will have to live for a month pursuant to the rules of parole. Christopher testified that he will then get his own place and should be in a position to care for S.C. about a month after that.

Christopher testified that he had moved to Little Rock and obtained his own apartment in October 2009. While in Little Rock, he was employed at a restaurant until he became incarcerated in March 2010. Christopher expects to return to that job upon being released from prison. Christopher completed parenting classes, and said that a Little Rock caseworker made monthly visits when he lived in his Little Rock apartment. Christopher testified that he attempted without success to get that caseworker to arrange visits with his son in Fort Smith. Christopher stated that he never missed any scheduled visit with S.C., and that the visits they did have went very well. He also stated that he has bought clothes and toys for S.C. Christopher testified that he participated in an alcohol-treatment program while in prison, and that he plans to complete a rehabilitation program after his release. Christopher stated that he currently has no driver's license, but that he will be able to get it back after attending DWI classes and paying a fee.

¶8 Christopher testified that he has done everything within his power to prove his stability to the court, and he asked for additional time to pursue reunification efforts with S.C. Alternatively, Christopher asked that the trial court place S.C. in the guardianship of S.C.'s maternal grandparents.

Tiffany's stepmother, Deborah Jelks, testified that she has always played a significant role in S.C.'s life, even before custody was placed with her and S.C.'s grandfather. Mrs. Jelks thought that at present neither Tiffany nor Christopher was able to take care of S.C., so that custody should remain with her and her husband. However, Mrs. Jelks stated that whether there was an adoption or a guardianship, she would like for both parents to remain in S.C.'s life. Mrs. Jelks indicated that she would like for there to be a regular visitation schedule, so that S.C. would know when he could expect to see his mom or dad.

Christopher's stepfather, John Unger, Jr., testified that on several occasions he contacted DHS on Christopher's behalf, mostly through emails. Mr. Unger indicated that he was trying to obtain services and set up visitation for Christopher. Mr. Unger indicated that despite his efforts, he either received no response from the caseworker or was told that they would get back with him. He indicated that DHS never arranged for any visitation until January 2010. Mr. Unger testified that he has seen substantial improvement in Christopher in terms of maturity and responsibility, and he thought that Christopher had a better opportunity to be a good parent now than he did before.

In this appeal, both Tiffany ¶9 and Christopher argue that there was insufficient evidence of the statutory grounds necessary to support the termination of parental rights. Both Tiffany and Christopher also

argue that termination of their respective parental rights was not in the best interest of the child. We hold that the trial court's finding that termination of parental rights was in S.C.'s best interest was clearly erroneous as to both Tiffany and Christopher. Because DHS failed in its burden of proving that termination was in S.C.'s best interest, we need not discuss whether DHS established the requisite statutory grounds.

■ Our holding in this case is largely grounded in the custody arrangement that was established after S.C. was removed from his parents' custody. S.C. has been placed in the custody of his maternal grandparents, and that is where he lived before this case began. The testimony established that S.C.'s maternal grandparents have been a significant influence in his life both before and after DHS took him into emergency custody. The DHS caseworker, Mr. Hesler, testified that this custody placement is excellent for S.C.

Tiffany's stepmother, Mrs. Jelks, testified:

> My wish with regard to S.C. is that I would love to be his grandparent instead of a parent, but I feel that perhaps at this point in time that neither Chris nor Tiffany are able to take care of him the way he should be taken care of. So I guess you would say he needs to stay with us.

While Mrs. Jelks accurately stated that neither parent is currently in a position to take care of S.C., she did not ask the trial court to terminate either of their parental rights. When asked what she thought was in S.C.'s best interest, Mrs. Jelks thought that S.C. should have some contact with his parents. Whether or not parental rights were terminated, Mrs. Jelks indicated that it was her desire to set up regular, scheduled visits between S.C. and each of his parents.

We fully recognize that Tiffany and Christopher exercised extremely poor judgment at the outset of this case when they allowed S.C. to be a passenger in a truck with Christopher driving intoxicated. However, there was no evidence that either parent had ever physically abused or harmed S.C. or were a threat to do so in the future. Therefore, we cannot see any significant potential harm in allowing the parents to visit S.C. and pursue reunification efforts.

We are also mindful that both parents, and particularly Tiffany, have been lacking in complying with the case plan and maintaining regular contact with the child. However, much of Tiffany's problems derived from her decision to move out of state, and she has since returned to Arkansas, completed a rehabilitation program and taken a psychological evaluation, and lives in Fort Smith. Her relocation back home should help facilitate more frequent visitation with S.C. As for Christopher, his visitation with S.C. was limited before his incarceration, but even the trial court acknowledged that it was not "terribly impressed with the visitation efforts" by DHS. Christopher demonstrated stability in housing and employment before his incarceration, and testified that he will be able to regain that stability after his release, which was anticipated to be only six weeks from the termination hearing. Moreover, while in prison Christopher attended alcohol counseling and upon his release he plans to enter a six-to-eight-week program at his expense.

In its brief, DHS cites *Bearden v. Arkansas Dep't of Human Servs.*, 344 Ark. 317, 42 S.W.3d 397 (2001), for the proposition that living in continued uncertainty is itself potentially harmful to children. DHS posits that, if appellants' parental rights had not been terminated, S.C.

could have languished in foster care indefinitely without any clear plan for stability or permanency.

This court is certainly aware of the need for certainty, stability, and permanency in a child's life. However, we are unable to subscribe to the idea that termination in this case will necessarily provide greater stability in S.C.'s life because he is in the custody of his grandparents, who will continue to care for S.C. and presumably be just as willing to adopt him at some future time should reunification efforts ultimately fail. *See Ivers v. Arkansas Dep't of Human Servs.*, 98 Ark.App. 57, 250 S.W.3d 279 (2007). We do not share DHS's concern that termination is necessary to ensure that S.C. does not "languish in foster care indefinitely," because he is not in foster care with strangers. He has continued in the custody of grandparents in the same place that he lived before this case began, and that is where he will remain whether or not his parents' rights are terminated in these proceedings.

This dependency/neglect case does not present the typical situation where the child is in the custody of nonrelative foster parents, or where the foster parents have expressed the desire to adopt as in *Bearden, supra,* cited by DHS. On the contrary, the custodian/grandmother in the present case expressly stated her desire that the child have continued contact with his parents as this is in the child's best interest. While time is of the essence in most termination proceedings, it is markedly less so given the factors presented in this case. We see little harm in affording both Tiffany and Christopher more time to pursue reunification with S.C., and such efforts come with a potential benefit to the child. Under the $|_{12}$facts of this case, we conclude that the trial court clearly erred

in finding that termination of parental rights was in S.C.'s best interest.

Reversed and remanded.

HART and HOOFMAN, JJ., agree.