BART F. VIRDEN, Judge
Dawnisha Covin appeals the order of the Sebastian County Circuit Court terminating her parental rights to QJ (11/09/06) and KJ (01/04/08). On appeal, Covin asserts that termination was not in the children's best interest because the parental rights of the father, Keith Jarrett, were not also terminated. We affirm.
We begin our analysis with a recognition that termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. Crawford v. Ark. Dep't of Human Servs. , 330 Ark. 152, 951 S.W.2d 310 (1997). We review termination-of-parental-rights cases de novo. Dinkins v. Ark. Dep't of Human Servs. , 344 Ark. 207, 40 S.W.3d 286 (2001). In termination cases, the circuit court must find by clear and convincing evidence that a parent is unfit and that termination is in the best interest of the child. J.T. v. Ark. Dep't of Human Servs. , 329 Ark. 243, 947 S.W.2d 761 (1997). This normally involves a two-step analysis: (1) that the Arkansas Department of Human Services ("Department") prove one or more of the statutory grounds for termination and (2) that the termination of parental rights is in the child's best interest. Ark. Code Ann. § 9-27-341(b)(3)(A) & (B) (Supp. 2017). Because Covin does not challenge the statutory grounds, we will address only the best-interest portion of the analysis.
I. Best Interest of the Children
Covin argues that the termination of her parental rights was not necessary or essential to protect the best interest of the *532 children. We turn our attention to the best-interest evidence before the circuit court.
On January 3, 2017, the circuit court entered a petition for emergency custody and dependency-neglect regarding QJ, KJ, ZC, and DC.[1] In the affidavit attached to the petition, family-service worker Steven Trout recounted the events leading up to the removal of the children from Covin's custody. On December 30, 2016, police requested that a Department family-service worker go to Covin's home. When Trout arrived, police officers had already removed Covin from the residence because she had become aggressive with an officer. Officers informed Trout that Covin's roommate called police when Covin, who was a methamphetamine user and appeared to be under the influence of amphetamines, grabbed a baseball bat and began smashing furniture. When police arrived at the apartment, they could hear the children crying and Covin screaming and cursing. They heard a heavy glass object hit the front door, and Covin shouted, "I don't want no police kicking in my fucking door." Eventually, Covin opened the door, and the officers could see broken glass all around and the children huddled together on the sofa. After a few questions from the police, Covin "seemed to completely lose any control she had at that point." She poked an officer in the chest when he tried to examine a cut on one of the children's hands, and after taking "an aggressive posture" with an officer, she was arrested. The children were very upset and afraid to speak to family-service workers. At the detention center, Trout attempted to interview Covin, but she was confrontational and aggressive, and she refused a drug screen. Covin was charged with four counts of first-degree endangering the welfare of a minor, resisting arrest, and second-degree assault. The Department alleged that the children's safety was in danger due to Covin's violent and dangerous behavior, her drug use, her refusal to be drug screened, and her arrest, which left the children without a guardian.
On the same day the emergency petition was filed, the circuit court entered an ex parte order for emergency custody and an order finding that there was probable cause that emergency conditions that necessitated the removal of the children from Covin's custody. Covin was ordered to stay in contact with the Department, submit to drug screens, and have no contact with the children.
The circuit court entered an adjudication order on June 19, 2017. In the order, the circuit court found that Covin had prior history with the Department and that "[Covin] appears to have relapsed and has engaged in behaviors that created an unsafe environment for the juveniles." Covin's arrest caused the children to be without a caregiver, and she tested positive for THC at the hearing. The court found by a preponderance of the evidence that the children were dependent-neglected, and it ordered Covin to obtain stable employment, transportation, housing, and income; complete parenting classes; undergo domestic-abuse counseling; undergo a psychological evaluation and complete any treatment recommended; submit to drug screening; resolve all criminal charges; stay in contact with the Department; and apprise the Department of her contact information and any significant events.
On November 29, the circuit court entered a review order in which it found that *533 Covin had not appeared at the review hearing, and her whereabouts were unknown. The court found that she had not complied with the case plan. The court noted that KJ and QJ's father, Keith Jarrett, was incarcerated at the time of the adjudication hearing and that he was released shortly after the hearing; however, Jarrett had been arrested again on new drug charges and had been incarcerated since then. Neither Covin nor Jarrett had obtained stable housing, employment, or transportation, and they had not completed counseling or undergone any psychological evaluation or drug screening. The parents had not resolved their criminal charges or maintained contact with the Department.
On March 12, 2018, the court entered the permanency-planning order. In it, the court found that return of the children to Covin's custody was contrary to their welfare and that the Department's custody should continue. The court changed the goal of the case to adoption and found that the children had been out of the home for twelve months, the parents had not made significant or measurable progress in the case plan or toward reunification, and the children could not be safely returned to the parents in a time period consistent with their needs. The court noted that Jarrett was out on bond, and his whereabouts were unknown. The court found that Covin had been present at the permanency-planning hearing; however, until recently, she believed that she would receive a lengthy prison sentence and had seen no reason to participate in the case plan. When Covin accepted a plea offer that did not include prison time, she decided to rehabilitate herself. The court observed that Covin recently made "eleventh-hour efforts" to avail herself of non-Department services provided by "Sister-to-Sister," an entity Covin admitted was created by her mother, Evelyn. Evelyn also signed Covin's certificates of completion of those parenting classes. Covin testified that she would test positive for drugs if screened that day. The court found that Covin had not maintained stable employment, although she testified that she had worked at Harps bakery. Covin had not completed Department services such as parenting classes, psychological evaluation, and domestic-abuse counseling, and she had not submitted to drug screens or maintained contact with the Department.
The Department filed a petition to terminate Covin's parental rights. In the petition the Department alleged that termination was supported by six statutory grounds and that it was in the children's best interest to terminate Covin's parental rights. Specifically, the Department alleged that the children are adoptable and that regardless of adoptability, it was in the best interest of the children to terminate parental rights because the risk of harm if the children were returned to the parents outweighed the adoptability factor. The Department alleged that Covin posed the potential for both physical and psychological harm.
On April 24, the circuit court held the first of two termination hearings. At the hearing, Jennifer Pedigrew, the intake coordinator at Western Arkansas Counseling and Guidance Center, testified that Covin came in to do paperwork related to her drug-and-alcohol assessment on August 16, 2017, but she left the premises before the assessment could take place. Covin "no-showed" three times after that.
Covin also testified at the hearing. She opined that her ongoing domestic-violence issue with her husband, Devorin Covin, from whom she was separated, "has nothing to do with this." Covin offered lengthy testimony downplaying the physical abuse *534 from Devorin and the negative effect witnessing the abuse had on the children.
The second termination hearing was held on May 11. Covin testified that Jarrett was incarcerated again, and because she learned that he was "married or something" she decided to end their relationship. Covin testified that up until his incarceration he frequently visited the children when they were placed with her sister and that he loves them.
Family-service worker Natosha Lowery testified that she was the primary caseworker until mid-June 2017. Lowery explained that the Department offered services to assist with housing, employment, and transportation, as well as parenting classes, domestic-abuse counseling, a drug-and-alcohol assessment, drug screening, and a psychological evaluation. Lowery testified that as far as she knew, Covin had not complied with the case plan except that "for a short stint" Covin had worked at Harps bakery and that she completed her psychological evaluation the week before the hearing. Covin had explained to Lowery that she had anticipated a thirty-two-year sentence in one court and a twenty-one-year sentence in another. Lowery explained that because Covin thought she was going to prison she did not avail herself of Department services. Lowery stated that when Covin did contact her it was about visitation, but she never showed up. Even though there was a no-contact order in place when the children were living with Covin's sister Darrasha, Lowery believed that the parents had unauthorized visitation with the children until they were removed from Darrasha's home. According to Lowery, the one hair-follicle drug test that Covin submitted to in February 2018 showed that she was positive for cocaine, benzos, and THC. Lowery noted that in 2011 and 2012, Covin had received the same services offered this time, and the current situation was a "mirror image" of what had occurred in 2011 to cause removal. Lowery explained that in 2011, the children were removed for parental drug use, environmental concerns such as broken glass and destruction of the home, guns in the home, and drug sales from the home. Lowery testified that from the Department's standpoint, Covin had not been rehabilitated in any way, and she had never been observed visiting with the children. Lowery opined that the children were at risk of psychological and physical harm if returned to Covin's custody.
Lowery testified that QJ is outgoing, does well in school and that she interacts well with others. KJ is outgoing, sweet, open-minded, and compassionate. Lowery opined that the children are adoptable. She explained that it was in the children's best interest to terminate Covin's parental rights because the family had been involved with the Department for over seven years, and the same problems existed. Lowery testified that
due to the illegal drug abuse, constant arrests, domestic violence, instability, can't prove to the Department that we can maintain a job. There's been no material support offered to the Department in respect to paying for clothes, paying for anything at the school. There's been no acknowledgment that they want to have their kids back in their home.
Caseworker Jasmine Brainard offered similar testimony that Covin had an unstable lifestyle, and she lived with her mother whose home the Department had determined was an unsuitable placement for the children. Brainard testified that Covin had only once tested negative for drugs during the pendency of the case and that she had been offered services but had not remedied the cause of removal.
*535 Covin testified that she currently lived with her mother and grandmother in a four-bedroom, two-bathroom home. Covin stated that she was newly employed with Mom 365 taking photographs for hospitals and that she had worked for Harps bakery from March to October until Harps closed. Covin testified that she had a car, a valid driver's license, and insurance. She submitted a certificate stating that she had completed parenting classes. Covin stated that she had been attending domestic-abuse counseling since February, and she had attended nine out of twenty classes. Covin explained that for the first twelve months she did not complete any courses or avail herself of services because she was afraid to have contact with the Department. Covin had been anticipating a fifty-two-year prison sentence and wanted to stay away from court and "feds."
At the hearing, the court granted Jarrett's motion to dismiss the termination petition against him because sixty days had not passed from the date of service; thus, his allotted time to respond had not yet run, and filing was premature. All parties agreed to the dismissal as to Jarrett, and the court granted the motion and stated, "[O]h absolutely, this is without prejudice."
The circuit court entered the order terminating Covin's parental rights on October 16, 2018. The court found that the petition for termination of Jarrett's parental rights was voluntarily dismissed without prejudice and that neither Jarrett nor his attorney had appeared at the May 15 hearing. The court also found that Jarrett's paternity of QJ and KJ had been established and that he is the legal and biological father of both children. The court found that all the statutory grounds alleged by the Department were supported by clear and convincing evidence. The Department had offered services as ordered, and despite the Department's efforts, the parents had reverted to past behaviors and "are no more fit today than when the Department first came into contact with them in 2011[.]"
The court also found that it was in the children's best interest to terminate Covin's parental rights, considering both the likelihood that the children would be adopted and the potential for harm if returned to Covin's custody. Specifically, the circuit court found that even though KJ and QJ would not be available for adoption at termination, it was still in their best interest to terminate Covin's parental rights. The court found that "the existence of her rights is a disruptive force" in the children's lives, and the risk of physical and psychological harm outweighs the issue of the testimony of adoptability. The court found Brainard's and Lowery's testimony to be credible, as was the testimony of the other witnesses for the Department, all of whom testified that there was risk of harm if the children were returned to Covin. The court found that Covin was "completely lacking in credibility," that she denied or minimized substance-abuse issues, domestic-violence issues, parenting issues, criminal acts, and overall stability issues. Covin timely filed a notice of appeal.
Covin argues that the termination of her parental rights was not necessary to protect the best interest of the children. She asserts that Jarrett's parental rights were intact at the time of the termination of her parental rights; thus, termination did not serve to achieve permanency for the children. Covin also contends that there was no proof that she posed the potential for harm to the children.
Covin asserts that this case is similar to Cranford v. Arkansas Department of Human Services , 2011 Ark. App. 211, 378 S.W.3d 851, *536 Caldwell v. Arkansas Department of Human Services , 2010 Ark. App. 102, 2010 WL 374432, and Lively v. Arkansas Department of Human Services , 2015 Ark. App. 131, 456 S.W.3d 383. In Caldwell and Lively , the child was in the permanent care of the mother, and in Cranford , the children were in the custody of the grandparents. This court reversed those termination decisions, finding that termination would not necessarily result in greater permanency or stability for the children in those particular circumstances. However, in Hayes v. Arkansas Department of Human Services , 2011 Ark. App. 21, 2011 WL 135198, we affirmed the termination of parental rights because of the risk of harm to the children should they ever be returned to the father despite the need for permanency. Covin argues that Hayes is inapplicable to the facts of this case because there is no evidence that she subjected the children to violence and abuse sufficient to warrant termination, and unlike Hayes, she had recently achieved a stable home and transportation, and she was actively availing herself of Department services such as parenting classes and domestic violence counseling.
Covin's arguments are misplaced. At the time of the hearing, the children were in the custody of the Department. As to Jarrett, who was incarcerated, the termination proceeding was delayed only to allow for the full amount of time to respond; thus, placement with Jarrett is not ensured as a permanent or stable option. The court also found that Covin lacked credibility, she had not demonstrated stability or fitness as a parent, she had abandoned her children for most of the case, and she had failed to comply with the case plan until just before the termination proceedings. It is well settled that credibility determinations are left to the circuit court. Newman v. Ark. Dep't of Human Servs. , 2016 Ark. App. 207, 489 S.W.3d 186. Covin's argument is a request for this court to reweigh the evidence, which it does not do. Blasingame v. Ark. Dep't of Human Servs. , 2018 Ark. App. 71, at 6, 542 S.W.3d 873, 876.
This case more closely resembles Brumley v. Arkansas Department of Human Services , 2015 Ark. 356, 2015 WL 5895440. In that case, our supreme court held that termination was appropriate despite the child's being placed with an aunt because Brumley, who was incarcerated, lacked essential components of the case plan, including stable housing and employment. Here, Covin had abandoned the children for most of the case, and any progress she made was late in the case plan, as far as twelve months after the filing of the original petition. Covin did not acknowledge either the seriousness of the domestic violence she experienced or the physical danger she had placed her children in during her violent outbursts, and she admitted that she had not made an effort to comply with the case plan for the first year of the case.
When determining the best interest of the child, the circuit court takes into consideration (1) the likelihood that the child will be adopted if the termination petition is granted and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii).
Arkansas Code Annotated section 9-27-341(b)(3) requires a circuit court's order terminating parental rights to be based on clear and convincing evidence. Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. Baker v. Ark. Dep't of Human Servs. , 340 Ark. 42, 8 S.W.3d 499 (2000). When the burden of proving a disputed fact is by clear and *537 convincing evidence, the question that must be answered on appeal is whether the circuit court's finding was clearly erroneous. Payne v. Ark. Dep't of Human Servs. , 2013 Ark. 284, 2013 WL 3322339. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. See id. This court gives high deference to the circuit court because that court is in a far superior position to observe the parties before it and to judge the credibility of the witnesses. See id.
On the basis of these facts, and given our high deference to the circuit court's determination of the evidence and the credibility of the witnesses, the circuit court's finding of best interest was not clearly erroneous.
Affirmed.
Gladwin and Whiteaker, JJ., agree.

Termination of Covin's parental rights to ZC (12/03/08) and DC (05/11/13) are not at issue in this appeal.