Cite as 2021 Ark. App. 77

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-20-574

| | | |
|---|---|---|
| M.S.<br><br>APPELLANT<br><br>V.<br><br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | **Opinion Delivered:** February 17, 2021<br><br>APPEAL FROM THE SALINE COUNTY CIRCUIT COURT [NO. 63JV-19-150]<br><br>HONORABLE GARY ARNOLD, JUDGE<br><br>AFFIRMED | |

## KENNETH S. HIXSON, Judge

Appellant M.S. appeals from the termination of her parental rights to her son, S.S. (d/o/b 2/18/19).[1]  On appeal, M.S. does not challenge the statutory grounds supporting termination.  Instead, M.S. argues that the termination order should be reversed because there was insufficient evidence that termination was in the child's best interest.  In making her sufficiency argument, M.S. relies heavily on the fact that S.S. was in the custody of S.S.'s putative father's parents when her parental rights were terminated.[2]  We affirm.

We review termination-of-parental-rights cases de novo.  *Mitchell v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 715, 430 S.W.3d 851.  At least one statutory ground must

---

[1]M.S. (d/o/b 10/4/02) was herself a minor when S.S. was born and when her parental rights were terminated.

[2]The trial court also terminated the parental rights of the child's putative father, Triston Rea (d/o/b/ 3/1/98), and Triston did not appeal.

exist, in addition to finding that is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341 (Supp. 2019); *M.T. v. Ark. Dep't of Human Servs.*, 58 Ark. App. 302, 952 S.W.2d 177 (1997). Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Musick v. Ark. Dep't of Human Servs.*, 2020 Ark. App. 87, 595 S.W.3d 406. The appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id*. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id*.

This case began on April 29, 2019, when appellee Arkansas Department of Human Services (DHS) filed a petition for emergency custody of eight-week-old S.S. Prior to the filing of the petition, M.S. and the putative father, Triston Rea, were living together, and S.S. was in their care. M.S. and Triston had taken S.S. to the hospital with a bruised and swollen forehead. M.S. advised hospital personnel that S.S. had rolled out of her arms and possibly hit the nightstand beside her bed. However, there were two points of impact to the baby's head, and the treating physician determined that M.S.'s explanation was inconsistent with the severity of S.S.'s injuries. S.S. was subsequently admitted to the hospital with a fractured skull. The treating physician also expressed concern because S.S. was significantly underweight. Based on these facts, DHS took an emergency hold of S.S. based on an immediate danger to S.S.'s health and physical well-being. The day after DHS's

2

petition was filed, the trial court entered an ex parte order of emergency custody. A probable-cause order followed on June 14, 2019.

On August 14, 2019, the trial court entered an adjudication order finding S.S. dependent-neglected based on a substantial risk of serious harm as a result of abuse, neglect, and parental unfitness. The adjudication order named Triston Rea as S.S.'s *putative father*, but Triston never submitted evidence of paternity and was never found to be S.S.'s biological father. In the adjudication order, the trial court noted that S.S. was in the provisional placement of the child's *putative* paternal grandmother and stepgrandfather, Misty and Ronnie Walls. The goal of the case was reunification with the concurrent goal of relative placement. M.S. was ordered to participate in individual therapy; submit to a psychological evaluation and follow all recommendations; submit to drug screens; visit the child; complete parenting classes; maintain a safe environment; and maintain adequate income to support herself and the child.

A review order was entered on December 30, 2019. In the review order, the trial court found that M.S. had not participated in DHS services nor shown any progress toward the goal of reunification. The trial court stated that M.S. was herself taken into foster care on August 22, 2019, but ran from that placement a few days later and had not been seen or heard from since. M.S. had not visited S.S. in more than four months. The trial court found that by M.S.'s absolute lack of contact with S.S. for several months she had abandoned him. The goal of the case was changed to termination of parental rights and adoption.

On January 30, 2020, DHS filed a petition to terminate M.S.'s parental rights. On February 24, 2020, DHS filed a motion to serve M.S. by warning order. In its motion,

DHS asserted that M.S.'s whereabouts were unknown and that it had made numerous unsuccessful attempts to locate her and provide her with actual notice of the termination proceedings. M.S. was served by warning order, and after two continuances,[3] the termination hearing was held on July 13, 2020.[4]

On July 15, 2020, the trial court entered an order terminating M.S.'s parental rights. The trial court found by clear and convincing evidence that termination of parental rights was in S.S.'s best interest, and the court specifically considered the likelihood that the child would be adopted, as well as the potential harm of returning him to the custody of his mother as required by Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii) (Supp. 2019). The trial court further found clear and convincing evidence of three grounds supporting the termination of M.S.'s parental rights. Pursuant to the Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)*, the trial court found that S.S. had been adjudicated dependent-neglected and had continued outside of M.S.'s custody for twelve months and, despite a meaningful effort by DHS to rehabilitate the parent and correct the conditions that caused removal, those conditions had not been remedied by M.S. The trial court also found, pursuant to Ark. Code Ann. § 9-27-341(b)(3)(B)(iv), that M.S. had abandoned S.S. Finally, pursuant to Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)*, the trial court found that M.S. had subjected S.S. to aggravated circumstances, which, for purposes of this case, means that S.S. had been neglected or abused to the extent that the abuse or neglect could endanger the life

---

[3]The continuances were a result of the COVID-19 pandemic.

[4]The putative father, Tristan Rea, was personally served with the petition; however, Triston filed a pro se answer to the petition wherein he gave all of his rights to Misty and Ronnie Walls. Triston did not appear at the termination hearing.

of S.S., or a determination is made by a judge that there is little likelihood that services to the family will result in successful reunification.[5]

Toni Hansberry, the DHS caseworker assigned to this case, testified at the termination hearing. Ms. Hansberry stated that after S.S. was removed from M.S.'s custody, M.S. visited S.S. regularly at first, and then the visits became sporadic. Ms. Hansberry indicated that, other than completing a psychological evaluation and possibly a drug-and-alcohol assessment, M.S. did not participate in DHS services before running away from her foster placement on August 26, 2019. M.S. remained on runaway status for the next seven months, during which time she had no contact with either DHS or S.S. M.S. was not located until April 1, 2020, when she gave birth to a second child, A.S. M.S. gave birth to A.S. at a residence in a bathtub and refused to go to a hospital to be checked out. DHS received a hotline report regarding A.S. and took A.S. into custody.

Ms. Hansberry testified that between April 1, 2020, and the July 13, 2020, termination hearing, M.S. participated in the case plan and had made some progress. M.S. participated in parenting classes and individual counseling and had recently gained employment. Ms. Hansberry stated that due to COVID-19, M.S. could not visit S.S. in person. However, FaceTime visits were arranged between M.S. and S.S.'s foster parents (the Walls), and M.S. visited S.S. twice via FaceTime. Ms. Hansberry testified that although

---

[5]Regarding putative father Tristan Rea, the trial court terminated Triston's parental rights pursuant to Arkansas Code Annotated section 9–27–341(b)(3)(B)(x)*(a)* and *(b)* in that the putative father did not establish paternity or have significant contacts with S.S. after being named and served as a party in a dependency-neglect proceeding.

M.S. was participating in DHS services and making some progress, she thought that M.S. was "going through the motions of checking boxes and . . . really not gaining."

Ms. Hansberry recommended that M.S.'s parental rights be terminated and S.S. be placed for adoption. Ms. Hansberry stated that M.S. was not able to achieve reunification. Because of S.S.'s skull fracture with an unknown cause, Ms. Hansberry believed S.S. would be placed in danger if returned to M.S.'s custody. Ms. Hansberry further testified:

> I've had FaceTime with S.S. and the Walls, and it is my opinion it appears that S.S. looks to the Walls as his parents. I think it would cause S.S. to be confused if we kept him living with the Walls and still continued to try to reunify when we don't know what's going to happen. If S.S. is adopted by the Walls he would take their last name and he would be part of a family. . . . [T]hey would be considered his parents and he would have all the rights and . . . access . . . to anything and everything that their other children have. He would be treated as one of their own children.

Ms. Hansberry gave the opinion that termination of parental rights was in S.S.'s best interest so he can have permanency and stability free from continuous DHS involvement.

Jamie Ramm testified that she has been M.S.'s foster parent since April 2020. Ms. Ramm also has M.S.'s younger child, A.S., in her custody. Ms. Ramm stated that M.S., who was three months away from turning eighteen, was doing well and progressing. However, Ms. Ramm expressed concern over whether, when she turned eighteen, M.S. would be able to safely care for her two children. Ms. Ramm stated that M.S. was sometimes frustrated and stressed while caring for A.S., and that placing another child in her care would add to the level of stress. Ms. Ramm gave the opinion that M.S. could take care of her children with the help of a solid support system.

Krista Buck testified that she is a court-appointed special advocate for S.S. Ms. Buck stated that S.S. has thrived in his foster placement with the Walls, and she recommended termination of parental rights. Ms. Buck testified:

> I think it would be in S.S.'s best interest to terminate parental rights because he knows the Walls as his family. He's been there for so long and he's not really known . . . other people as his parents. He's known the Walls as his parents. And I don't know what that would do to him to pull him from a situation [where] that's what he's used to. He's safe. He's happy. That's what he knows. And he's known that for a long time.

Caitlyn Catrell is an adoption specialist. Ms. Catrell testified that S.S. does not have any major medical or behavioral concerns that would inhibit an adoption. Using a data-match system, Ms. Catrell identified 435 potential adoptive homes. Ms. Catrell gave the opinion that S.S. is highly adoptable.

M.S. testified on her own behalf. M.S. stated that she is taking parenting classes and is working toward obtaining a driver's license and her GED. M.S. stated that she has been employed for a month and is taking care of A.S. in her foster parent's home. M.S. acknowledged that she was under a lot of stress and that she smokes cigarettes because it is the only thing she "can go to to not completely lose it." M.S. indicated that taking care of her children is her top priority.

Misty Walls testified that she and her husband, Ronnie, have been S.S.'s foster parents since this case began. Mrs. Walls is the mother of the putative father, Triston Rea, although she said she did not know where he was and had not seen him in a couple of months. Mrs. Walls discussed how the FaceTime visits between M.S. and S.S. had been arranged. Mrs. Walls also testified that all of S.S.'s needs were being met in her care.

7

In this appeal, M.S. does not challenge the statutory grounds supporting termination. M.S. instead argues that the trial court clearly erred in finding that termination of her parental rights was in S.S.'s best interest. M.S. acknowledges in her brief that she was not in a position to have custody of S.S. at the termination hearing, but she claims that she was making progress and that this is not a situation, or in S.S.'s best interest, where termination was necessary for S.S. to receive permanency. In her best-interest argument, M.S. does not specifically challenge the trial court's findings of adoptability and potential harm; rather she asserts that the court is not limited to only those factors in determining best interest. M.S. argues that among the factors the court should have considered in determining best interest is the preservation of the child's relationship with grandparents. *See Lively v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 131, 456 S.W.3d 383. M.S. primarily relies on the fact that S.S. was living with Misty and Ronnie Walls, whom she refers to as S.S.'s "paternal grandparents," at the time of the termination. M.S. presents a two-pronged argument in her best-interest analysis. First, she argues there was a less restrictive "permanent relative placement" available with the Walls, citing Ark. Code Ann. § 9-28-105 (Repl. 2015). M.S. asserts that preferential consideration is given to relatives when considering custodial placements. Second, in further support of her best-interest argument, M.S. urges us to reverse the termination order by applying *Cranford v. Arkansas Department of Human Services*, 2011 Ark. App. 211, 378 S.W.3d 851, and *Bunch v. Arkansas Department of Human Services*, 2017 Ark. App. 374, 523 S.W.3d 913, which were cases where the children were in the custody of their grandparents and under the particular facts therein, we reversed the

8

termination orders. We conclude that the statute relied on by M.S. is inapplicable, and that *Cranford* and *Bunch* are easily distinguishable.

M.S.'s argument in support of retaining her parental rights is almost entirely premised on S.S.'s provisional custodial relative placement with the Walls, whom M.S. refers to as grandparents. Although a child's relationship with relatives may be considered as one factor in assessing the best interest of a child, it has never been dispositive. Moreover, contrary to M.S.'s argument, considering the evidence in the record, the Walls are not S.S.'s relatives as defined by the applicable statute, and therefore are not afforded any statutory preference with respect to S.S.'s custodial placement.

Arkansas Code Annotated section 9-28-105 provides: "In all custodial placements by the Department of Human Services in foster care or adoption, preferential consideration shall be given to an adult relative over a nonrelated caregiver, if: (1) The relative caregiver meets all relevant child protection standards; and (2) It is in the best interest of the child to be placed with the *relative* caregiver." (Emphasis added.) "Relative" is defined as "a person within the fifth degree of kinship by virtue of blood or adoption." Ark. Code Ann. § 9-28-108(a)(2) (Supp. 2019).

Under the undisputed facts of this case, the Walls are not the *relatives* of S.S. as defined in the statute. Misty Walls is Triston's Rea's mother, and Ronnie Walls is Triston's stepfather. Triston was identified in this case only as the *putative father*, which means "any man not deemed or adjudicated . . . to be the biological father of a juvenile who claims to be or is alleged to be the biological father of the juvenile." Ark. Code Ann. § 9-27-303(47) (Supp. 2019). It is the putative parent's burden to prove paternity, Ark. Code Ann. § 9-

9

27-325(o)(4), and Triston was never found to be the biological father or the "parent" of S.S. Arkansas Code Annotated section 9-27-303(40) defines "parent" and provides that a parent can be established by adoption, by a man who is married to the biological mother at the time of conception, by a man who has signed an acknowledgment of paternity, or by being found by a court of competent jurisdiction to be the biological father. None of these definitions describe Triston Rea. Of significance is that the trial court terminated Triston's parental rights pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(B)(x)*(a)* and *(b)* finding that the Triston did not establish paternity or have significant contacts with the child after being named and served as a party in a dependency-neglect proceeding. Triston did not appeal. It is well established under Arkansas law that grandparents' rights are derivative of their child's parental rights, and that because a grandparent's rights are only derivative, they may be contingent upon establishment of paternity and are subject to divestment when parental rights are terminated. *Suster v. Ark. Dep't of Human Servs.*, 314 Ark. 92, 858 S.W.2d 122 (1993). Because Triston never established paternity of S.S. and any rights he had were extinguished by the termination order, he has no parental relationship with S.S. That being so, the Walls are not S.S.'s grandparents or his relatives, and the statutory preference for relative custody set forth in Ark. Code Ann. § 9-28-105 has no application to this case.

In a similar vein, M.S. also argues that because the Walls are S.S.'s grandparents, we should reverse the termination of her parental rights as we did in *Cranford*, *supra*, and *Bunch*, *supra*. M.S.'s reliance is again misplaced for similar reasons. In *Cranford*, we reversed the termination of both parents' parental rights pursuant to our holding that the trial court clearly erred in finding termination to be in the child's best interest. In that case, after the

10

child was removed from the parents, he was placed in the custody of his *maternal* grandparent. Without distinguishing *Cranford* any further, it is clear that *Cranford* is inapposite. In *Cranford*, the grandmother was, in fact, the maternal grandmother of the child. Here, Mrs. Walls is not the grandmother of S.S. as explained above.

In *Bunch*, *supra*, we reversed the termination of the mother's parental rights, holding that the trial court clearly erred in finding termination to be in the children's best interest. In *Bunch*, the minor children were placed with the maternal grandmother; however, the mother and children continued to have a meaningful relationship. Again, here, in contrast with *Bunch*, Mrs. Walls is not the child's grandmother. Because Mrs. Walls is not S.S.'s grandmother as explained *supra*, there is no need to distinguish *Bunch* any further. *Bunch* has no application.

Termination-of-parental-rights cases must be decided on their own facts, and in this case the pertinent facts bearing on S.S.'s best interest are as follows. When S.S. was just eight weeks old, M.S. brought him to the hospital in a malnourished condition with a skull fracture that could not be adequately explained. As a result of the severity of S.S.'s injury, S.S. was removed from M.S.'s care and S.S. was adjudicated dependent–neglected based on a substantial risk of serious harm as a result of abuse, neglect, and parental unfitness. After initially exercising some visitation, M.S., at a time when S.S. was still an infant, absented herself from the case for a period of seven months, during which time she had no contact whatsoever with DHS or S.S. Because M.S. was on runaway status and could not be found when DHS filed its petition to terminate her parental rights, M.S. had to be served with the petition by warning order. S.S. was located only when, after having birthed her second

11

child, a hotline report was made and a new dependency-neglect proceeding was initiated as to that child. Although M.S. did participate in some DHS services after her reappearance in the case while termination was looming, M.S.'s caseworker thought that M.S. was "checking the boxes" as opposed to making meaningful progress toward reunification. M.S. visited S.S. just twice in the eleven months preceding the termination hearing. Both the caseworker and S.S.'s court-appointed special advocate recommended termination of M.S.'s parental rights. In spite of this evidence, M.S. argues against termination based on S.S.'s relationship and "relative" placement with the Walls. However, for the reasons previously articulated, the Walls are not S.S.'s relatives, and this argument is meritless. Having reviewed the record de novo, and giving due consideration to the health and safety of S.S. and his need for permanency and stability, we hold that the trial court's decision to terminate M.S.'s paternal rights was not clearly erroneous.

Affirmed.

GLADWIN and VAUGHT, JJ. agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Kimberly Boling Bibb*, attorney ad litem for minor child.