Anthony IVERS, Sr. & Misty Rhine *v.*
ARKANSAS DEPARTMENT OF HUMAN SERVICES

CA 05-1281, CA 06-137                                    250 S.W.3d 279

Court of Appeals of Arkansas
Opinion delivered February 21, 2007

[Rehearing denied April 4, 2007.]

*Dale Casto*, for appellant Anthony Ivers, Sr.

*Gail Segers*, for appellant Misty Rhine.

*Gray Allen Turner*, for appellee.

*Diane Warren*, attorney ad litem for the minor child.

JOSEPHINE LINKER HART, Judge. On September 13, 2006, we took under submission *Ivers v. Arkansas Department of Human Services*, CA05-1281, a case in which Anthony Ivers, Sr., appealed from an order adjudicating his newborn child, A.I., dependent-neglected, relieving ADHS of providing reunification services for him, and establishing adoption as the permanency goal for A.I. We were made aware by appellee ADHS that, over Ivers's objection and after Ivers's filed his notice of appeal in CA05-1281, the trial court proceeded to a hearing on the termination of Ivers's parental rights and granted the termination petition. Ivers's brief appealing the termination of his parental rights had already been filed under docket number CA 06-137. Pursuant to Rule 3(c) of the Arkansas Rules of Appellate Procedure—Civil, we ordered consolidation of CA05-1281 and CA06-137. Also docketed under CA06-137 is the no-merit appeal of Misty Rhine, the mother of A.I. We now decide these cases.

*I. CA05-1281 Adjudication and Relieving ADHS of Providing Services to Ivers.*

In CA05-1281, Anthony Ivers, Sr., appeals from an order of the Washington County Circuit Court adjudicating his son, A.I., dependent-neglected and relieving the ADHS from providing him with reunification services. On appeal, he argues that: 1) the trial court erred in finding that the emergency situation which necessitated the removal of A.I. from the mother's custody on April 5, 2005, justified the child's removal from his custody because he was a "non-offending parent"; and 2) the termination of his parental rights as to a sibling of A.I. alone was an insufficient basis to find that he was an unfit parent and that reunification services would be unlikely to result in reunification. We reverse and remand.

On April 2, 2005, A.I. was born to Misty Rhine, Ivers's fiancée. At the time, Rhine was being held in juvenile detention on drug charges. The next day, ADHS asserted a seventy-two-hour hold on the child and subsequently petitioned for emergency custody, asserting that Rhine had been returned to juvenile detention and that "the newborn did not have an appropriate care giver to be released to from the hospital." Although Ivers was listed as a defendant, he was not given notice of the April 8, 2005 probable-cause hearing, pursuant to which A.I. was kept in ADHS custody.

ADHS subsequently filed a dependency/neglect petition for A.I. At the May 11, 2005 adjudication hearing, Ivers moved to have the probable-cause order set aside, asserting lack of notice. The trial court scheduled a probable-cause hearing for the next day. At that hearing, Ivers offered to waive probable cause in exchange for the trial court setting the adjudication at least forty-five days in the future. However, the trial judge elected to hear testimony.

ADHS supervisor and caseworker Karen Jones testified that Rhine was currently undergoing inpatient drug rehabilitation at Gateway and that Ivers was voluntarily attempting to enter a residential drug-treatment program at Decision Point. She was asked about whether A.I. tested positive for drugs when he was born and she could not provide any information.

Rhine's juvenile probation officer, Kolin Blakely, testified that Rhine had been placed on probation on May 5, 2003, after she pleaded guilty to two counts of second-degree forgery. Blakely stated that Rhine was subjected to random drug screens and "had

quite a few positive drug tests, as well as a few negative drug tests." Because the positive tests violated the conditions of her probation, Blakely had Rhine arrested, and she was subsequently placed in juvenile detention. Regarding Ivers, Blakely testified that he attempted to perform a drug test on him, but that Ivers had refused. However, in subsequent encounters with Ivers, she found him to be helpful in dealing with Rhine.

Helen King, A.I.'s grandmother, testified that she had custody of A.I.'s sister and was currently exercising visitation with A.I. She stated that she wanted to keep A.I. "within the family" but expressed concern about her financial means to take care of both siblings. She acknowledged that Rhine was currently in drug rehabilitation at Gateway and stated that she would like to see A.I. join his mother at that facility. Rhine testified briefly that Ivers was A.I.'s father because he was the only man with whom she had sex. She also confirmed that she was in a drug-treatment program and that Ivers's name was on A.I.'s birth certificate. Ivers testified that he was A.I.'s father and that he was scheduled to voluntarily enter the detox program at Decision Point for the second time.

The trial court again found probable cause, based on "the parent's drug use." The trial court also made a finding that Ivers was the legal and biological father of A.I.,[1] and ordered both parents to complete drug rehabilitation and submit to random drug testing. Ivers was also authorized to visit A.I. at ADHS.

Prior to the second adjudication hearing, the attorney ad-litem filed a motion that requested that ADHS be relieved from providing reunification services to A.I.'s parents and for the establishment of a permanent placement plan for A.I. The matters were taken up in two settings, June 29 and July 7, 2005.

At the June 29, 2005, hearing, Jones again testified. She stated that she "believed" that A.I. had traces of drugs in his meconium[2] when he was born. Jones noted that Rhine had not completed the residential drug-treatment program that she was enrolled in as of the last hearing. She noted that Rhine was currently living with Ivers in his father's home, but admitted that she had not visited the residence. Jones also stated that Ivers had not entered Decision Point. According to Ivers, there had not

---

[1] While paternity had not been previously adjudicated, Ivers's name was apparently on A.I.'s birth certificate.

[2] Prenatal feces.

been space available for him in the program. Alyssa Pamela Todd of Decision Point confirmed that Ivers had not been admitted to the inpatient program, but noted that Ivers had diligently pursued placement and was only denied admittance because of their long waiting list.

Rhine testified that she currently was living with her mother and Ernie Ivers. She attended inpatient-drug treatment for forty-two days, but did not complete the program. She claimed that she was eliminated from the program when she failed to bring A.I. with her to the facility as she claimed she would. The hearing was then continued until July 7, 2005. Rhine testified that at that time she wanted to avail herself of outpatient-drug treatment. That morning both she and Ivers had been tested for drugs, and the tests were negative. Rhine stated that she was currently on the waiting list for public housing in Springdale and was currently employed. She was scheduled to begin attending parenting classes on Monday. Rhine claimed that the last time she used methamphetamine was in January, which resulted in her being incarcerated.

Ernie Ivers, the paternal grandfather, testified that he wanted A.I. to be placed with him. He admitted that he had drug charges filed against him in the past, but the charges were dropped three months ago. The disposition of the charges were confirmed by public documents. He also admitted to prior marijuana use, but he further stated that his recent drug tests had all been negative. Ernie stated that he had an annual income of $60,000 and would be able to provide for A.I.'s needs.

Ivers testified next. He stated that he had been living at Decision Point since July 1, 2005. He had been on the waiting list for treatment since May 9, 2005. Ivers stated that he had employment waiting for him when he finished drug treatment. He admitted that he was a drug addict, but he was coping with his "disease." Ivers stated that the drug charges that he had pending against him in Missouri had been dropped, and the trial court took judicial notice of that fact. He did, however, admit that he pled guilty to weapons charges and was currently on three years' probation. Ivers asserted that he had not tested positive for drugs during the pendency of this case.

The trial judge announced from the bench that A.I. was dependent-neglected pursuant to Garrett's Law due to Rhine's drug use during her pregnancy. Further, she announced that she could not place A.I. with Ivers because he admitted that he was an

addict and was currently in inpatient drug treatment. The trial judge then examined Ernie Ivers's criminal history by obtaining information from NCIC and, upon finding that he had no outstanding charges, ordered ADHS to conduct a home study to determine his fitness as a custodian for A.I.

The trial court next took up the ad litem's motion that there be no reunification. Kolin Blakely again testified about Rhine's probation, noting that she had a positive drug test on January 6, 2005. Blakely noted that in the course of his supervision of Rhine, he visited the residence that she shared with Ivers. During a visit he noted what he believed was drug paraphernalia in plain view. He also noted empty beer cans and an empty liquor bottle on the floor.

Jones again took the stand. In her brief testimony, she admitted that Ivers had always been cooperative and had taken the opportunity to enter drug treatment. She had no knowledge of him failing any drug tests.

The trial court granted the no-reunification motion. It found that there was clear and convincing evidence of a termination of parental rights as to A.I.'s sibling. The trial court noted that reunification services had been provided for the sibling and that they were unsuccessful. The trial judge acknowledged that Ivers was currently getting inpatient drug treatment, had never been convicted of drug charges, and had a job, but concluded nonetheless that it "doesn't necessarily mean that their services to him will result in successful reunification." She stated that Ivers "continues to have criminal arrests for felony charges or other items," which she concluded was "history that's repeating itself." The court found "chronic drug use and criminal activities of both parents" compelling reasons to change the goal from reunification to termination.

On appeal, Ivers first argues that the trial court erred in finding that an emergency situation which necessitated the removal of A.I. from Rhine's custody on April 5, 2005, justified the removal of A.I. from his custody because he was a "non-offending parent." Further, he contends that throughout the numerous hearings, there was insufficient evidence of his "unfitness" to justify keeping A.I. in ADHS custody or to keep ADHS from considering a relative placement of A.I. with the child's paternal grandfather, Ernie Ivers.

We note, however, that Ivers "waived probable cause" at the second probable-cause hearing. Accordingly, Ivers is therefore constrained by the actions of his attorney, and we cannot

re-litigate this issue on appeal. *See Jones v. Arkansas Dep't of Human Servs.*, 361 Ark. 164, 205 S.W.3d 778 (2005). Regarding his contention that the court should have considered Ernie Ivers as a placement option, based on our reading of the record, we must conclude that the trial court did so. Accordingly, we hold that this point is of no moment.

For his second point, Ivers argues that the termination of his parental rights as to a sibling of A.I. alone is not a sufficient reason to change the permanency goal to termination of his parental rights without clear and convincing evidence that he was an unfit parent and that it is unlikely that reunification services would result in placement of A.I. in his custody. Ivers concedes that proof of the prior termination of his parental rights as to one of his children satisfies subsection (b)(3)(B)(ix)(a)(4) of Arkansas Code Annotated section 9-27-341 (Supp. 2005). Nonetheless, he contends that, pursuant to subsection (b)(3)(A)(i) and (ii), there must also be clear and convincing evidence that termination is in the best interest of the child.

██ We believe that this case is controlled by *Conn v. Arkansas Department of Human Services*, 79 Ark. App. 195, 85 S.W.3d 558 (2002). As in the instant case, the trial court in *Conn* relied on the prior termination of a sibling to change the permanency goal from reunification to termination. We reversed, holding that where there was no clear and convincing evidence that termination was in the child's best interest, the trial court erred in finding that the prior termination was sufficient grounds for terminating a sibling. *Id.* Likewise in the instant case, if we were to excise the prior termination, we are only left with the trial court's speculation that Ivers would not be able to control his drug problem. The trial judge made this finding despite noting that Ivers was currently receiving inpatient drug treatment. He was therefore in full compliance with the orders of the court, so there was no justification for changing the goal at that point. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Dinkins v. Arkansas Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). Here at all times since ADHS has been involved with this case, Ivers has not been found to have any drugs in his system. Furthermore, there is no evidence that Ivers's drug treatment will not be successful. Accordingly, we hold that the trial court's decision is clearly erroneous. We therefore reverse and remand this

case, and we order that upon remand, reunification services be provided to Ivers.

## II. CA06-137 Termination of Ivers's Parental Rights.

Ivers timely appealed the adjudication and the order relieving ADHS of providing reunification services. However, ADHS filed a petition to terminate his parental rights and the trial court brought the matter to a hearing while the case was pending on appeal.[3]

At the hearing, the trial court incorporated all previous testimony and exhibits into the termination proceeding. Little additional evidence was taken. Caseworker Karen Jones testified that she had not had any contact with the parents since the trial court relieved ADHS from providing reunification services. She admitted that she had no direct knowledge of the status of the parents' drug treatment or even their residence. She stated, however, that both Rhine and Ivers told her that morning that they were both in inpatient drug treatment at Decision Point. Jones testified that A.I. was in his third foster home, and she has not pursued placement of A.I. with Rhine's mother, Helen King, since the initial removal of the child from the parents' custody. During Jones's testimony, the trial court reviewed the court-ordered drug screening results and noted that they "were all clean in this case."

King testified that her adoption of Rhine's other child, Kaitlyn, had been finalized. She stated that although she was initially "hesitant" to take A.I., she was now willing to adopt him as well. She testified that she had been granted unsupervised visitation with A.I., but she had not seen him in a month.

Rhine testified that she was currently living at Decision Point, and the program was willing to accept A.I. living with her while she received treatment. She stated that if that was not possible, she would like A.I. to be placed with King. Rhine said that she would be willing to consent to termination of her parental rights if it would facilitate placement of A.I. with King.

---

[3] At the time that we ordered consolidation of these cases, it was an open question as to whether the trial court had jurisdiction to proceed to the termination hearing while the adjudication was on appeal. However, the supreme court subsequently handed down *Harwell-Williams v. Arkansas Department of Human Services*, 368 Ark. 183, 243 S.W.3d 898 (2006), which held that the termination hearing was one of the "further hearings" authorized by Arkansas Code Annotated section 9-27-343(c) (Supp. 2005).

Ivers testified that he had been at Decision Point for three weeks. He admitted that he had been discharged previously from the program because he had a migraine and had taken a Vicodin. Ivers stated that when he was discharged from Decision Point on July 10, 2005, he submitted to a drug test at ADHS a week later and that test was negative. He was readmitted to Decision Point on September 10, 2005. Excluding the time that he was in inpatient drug treatment, Ivers testified that he had lived in the same home with his father. Ivers acknowledged that he was ordered by the court to submit to a hair-follicle test, but did not know why he had not done so. He claimed that he gave all of his money to his father to help him pay rent and that he "really didn't have the money."

The trial court terminated both parents' parental rights. It found that their rights had been terminated as to a sibling due to illegal drug use and their "indifference" to getting help for their problem. Further, it found that A.I. had been "subjected to aggravated circumstances by the parents' ongoing drug use." The trial court also found that neither parent had remedied the conditions, i.e. the drug use, that had resulted in the child's removal, and neither parent had submitted to the hair follicle test that it had ordered. Finally, the trial court found that the "child deserves permanency" and the parents had "manifested the inability to remedy the conditions that caused [the child] to be put into custody." The trial judge acknowledged that Decision Point takes mothers and their minor children, but found that "the health and safety of this child would be in grave danger if I allow the child to go home with Misty today or go to Decision Point and stay there in light of her track record of just in May of this year getting booted out of—or leaving, against medical advice, Gateway three days before her anticipated discharge date. I can't send him off with Anthony today, Anthony Sr., for the same reasons."

Ivers argues that the trial court erred in finding that there was sufficient evidence to terminate his parental rights and that it was in the best interest of the child. He notes that the child was initially placed in ADHS custody because of "Garrett's Law," an offense that he, in not being the birth mother, could not perpetrate.[4] He asserts that he was "cooperative and forthcoming" throughout this case and "achieved or partially achieved all of the

---

[4] Ivers notes that the trial court interpreted "Garrett's Law" to state "a baby born with illegal drugs in his or her system is a definition of neglect, and 'extreme cruelty inflicted on the juvenile.'"

requirements ordered by the court that were under his control." Furthermore, he argues that ADHS's primary witness at the termination hearing, Karen Jones, admitted that she had no direct knowledge of his compliance with the case plan. He discounts his failure to obtain a hair-follicle test because there was already testimony that he had abused drugs in the past, he was already submitting to drug screening, and the test was "cost prohibitive to those who have been determined indigent." As he did in appealing the adjudication, Ivers again relies on *Conn v. Arkansas Department of Human Services, supra,* for the proposition that the trial court erred in relying on the prior termination of his rights as to Kaitlyn to terminate his rights to A.I., in light of the fact that he "substantially complied" with the case plan.

We review termination of parental rights cases de novo. *Dinkins v. Arkansas Dep't of Human Servs.,* 344 Ark. 207, 40 S.W.3d 286 (2001). We judge the factual basis for terminating parental rights under a clearly erroneous standard; however, with regard to errors of law, no deference is given to the trial court's decision. *See Sanford v. Sanford,* 355 Ark. 274, 137 S.W.3d 391 (2003).

■ We agree that the trial court erred in terminating Ivers's parental rights. We believe that Ivers's reliance on *Conn v. Arkansas Department of Human Services, supra,* is sound. We note that the termination of Kaitlyn was based on the parents' continued drug use, incarceration, failure to establish a permanent residence, failure to seek drug treatment, and failure to materially support the child. Here, there was no conclusive evidence that any of these failings persisted. In fact, Ivers has demonstrated commendable resolve in seeking to remedy his drug problem. While we are mindful that there have been missteps, we cannot ignore the fact that this progress has been made *after* the trial court relieved ADHS of the responsibility of providing reunification services.

Likewise, we believe that it was mere speculation on the part of the trial judge that Ivers would not be able to recover from his drug addiction. Unlike the first termination, mere months before the case at bar was decided by the trial court, Ivers showed a determination to seek drug treatment and apparently to follow through. Absent from the record before us is any testimony, expert or otherwise, opining that Ivers will not be able to remedy his drug problem. Furthermore, we believe that the record shows general compliance with every aspect of the case plan. We are mindful that Ivers did not submit to a hair-follicle test, however, we hold that

it is of no significance. Ivers concedes that, at worst, the test would show prior drug use, which is not disputed. Finally, we are unable to subscribe to the idea that termination in this case will necessarily provide greater stability in the life of A.I. We note that placement options were still being considered by ADHS at the time of the termination hearing, the primary placement option that was under consideration was with the child's maternal grandmother, Helen King. Unlike a stranger adoption, King's motivation for agreeing to take the child arose from the fact that A.I. was her grandchild and she already had adopted A.I.'s sister. Those motivations would not be affected by A.I. being a few months or even years older. Finally, we cannot ignore the fact that while in ADHS custody, A.I. had already been in three foster homes.

The fact that the trial court indicated that placing the child with Helen King is the primary placement option under consideration affects our decision in this case in other ways as well. Ivers and Misty Rhine are still in a relationship, and regardless of whether that relationship lasts, they nonetheless will know if A.I. is placed with King. We are not so naive as to believe that the legal termination of his parental rights will keep Ivers from desiring to be part of the child's life. Consequently, we are left with a firm and definite conviction that the trial court erred in finding that it would be in the child's best interest to terminate Ivers's parental rights, when the provision of reunification services would have the potential to help resolve Ivers's drug issues. As long as the case remains open, there is the potential for salutary oversight as well as the added motivation that arresting his drug problem will bring him custody of his child. Termination of his rights will destroy this potential. If one thing is apparent in this case, it is that Ivers and Rhine have the ability to replace their children nearly as fast as ADHS can terminate their parental rights to them. It is imperative that ADHS continue to work with Ivers to assist him in acquiring the ability to properly execute his parental responsibilities.

Because we believe that the termination of Ivers's parental rights was premature, we reverse and remand for the provision of reunification services and further orders consistent with this opinion.

III. *CA06-137 No-Merit Termination of Misty Rhine's parental rights.*

Misty Rhine appeals from an order terminating her parental rights to A.I. However, her appellate counsel has filed a motion to withdraw and a no-merit brief pursuant to the supreme court's

decision in *Linker-Flores v. Arkansas Department of Human Services*, 359 Ark. 131, 194 S.W.3d 739 (2004), and Ark. Sup. Ct. R. 4-3(j)(1). The clerk of this court sent appellant a certified copy of counsel's brief and the motion to be relieved, informing her of the right to file pro se points for reversal under Ark. Sup. Ct. R. 4-3(j)(2). Rhine has not filed a list of points.

■ Counsel's motion was accompanied by a brief purporting to list all adverse rulings made at the termination hearing and explaining why there is no meritorious ground for reversal to each ruling. We note, however, that he failed to discuss Rhine's motion for a continuance, made for the purpose of allowing her mother to become the adoptive parent of A.I. Certainly, this option would be a less restrictive alternative than termination and stranger adoption. Because counsel has failed to strictly comply with the requirements established by the Arkansas Supreme Court for no-merit appeals in termination cases, we deny counsel's motion to be relieved and order that oversight be corrected. In ordering rebriefing, we do not intend to forestall the possibility that this point be considered and briefed as a merit point when this case is resubmitted.

Reversed and remanded as to Ivers.

Motion to be relieved as to Rhine denied; rebriefing ordered.

MARSHALL and HEFFLEY, JJ., agree.