Cite as 2021 Ark. App. 232

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-21-12

| | |
|---|---|
| HEATHER SHELTON | **Opinion Delivered** May 12, 2021 |
| APPELLANT | APPEAL FROM THE UNION COUNTY CIRCUIT COURT [NO. 70JV-19-95] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE EDWIN KEATON, JUDGE |
| APPELLEES | AFFIRMED |

## N. MARK KLAPPENBACH, Judge

Heather Shelton appeals the order of the Union County Circuit Court terminating her parental rights to her son, LD. On appeal, Shelton argues that the circuit court erred in finding that termination was in LD's best interest. We affirm.

Eighteen-month-old LD was taken into custody by the Arkansas Department of Human Services (DHS) on July 17, 2019. Both Shelton and LD's father, James Dunn, were arrested on that date, and Shelton left LD in the care of his maternal grandmother, Deanna Rogers. During a health and safety assessment of Rogers's home, Rogers stated that she could not keep LD, and she admitted smoking THC and taking Valium without a prescription. Shelton disclosed to caseworkers that LD had been present for several domestic-violence incidents between her and Dunn with the most recent occurring a few days earlier. Shelton thought that Dunn had broken her ribs in a physical assault a month earlier.

A protective-services case had been open for more than a year after both Shelton and LD tested positive for methamphetamine at his birth. Numerous attempts to drug screen Shelton in the protective-services case were unsuccessful because Shelton had failed to produce a urine specimen. In June 2019, she admitted that she had been using methamphetamine occasionally. Shelton was released from police custody the same day as her arrest, but due to her continued drug use and domestic violence, DHS believed LD's health and safety would be at risk by returning him to Shelton's custody.

Following an August 2019 adjudication hearing, LD was adjudicated dependent-neglected due to domestic violence and Shelton's admitted drug use. The court ordered that upon being requested to submit to a random drug screen, the parents would have forty-five minutes to produce a sample; if no sample was provided within the allotted time period, the court would consider it a positive drug screen. Review hearings were held in December 2019 and April 2020 at which the court heard evidence that Shelton had not complied with the case plan and court orders. She had failed to submit to drug screens, had been incarcerated, and lacked suitable housing. A permanency-planning hearing was held on July 6, 2020, wherein the goal was changed to adoption. The court found that Shelton had not maintained consistent contact with DHS, participated in the case plan, or followed court orders. The parents had not addressed the issues that caused removal, and they lacked a suitable home. Shelton was ordered to complete a hair-follicle test following the hearing, and Dunn was ordered to complete a hair-follicle test by noon the next day.

The termination hearing was held on September 25. Mydeana Bridges, a Department of Children and Family Services supervisor, testified that after LD had been removed,

2

Shelton and Dunn continued their pattern of failing to provide urine samples for drug testing. Bridges said that Shelton's issues with submitting to drug screens had improved somewhat since the permanency-planning hearing on July 6, but she had failed to report for drug screens requested on July 16 and August 6 after stating that she would come in. Furthermore, Shelton tested positive for oxycodone on August 4, and Bridges did not have proof that Shelton had a prescription for this drug. Shelton tested negative on the other drug screens she had submitted to since July. Dunn had tested positive for methamphetamine on September 9.

Shelton did not submit to the hair-follicle test that the court ordered her to complete on July 6. She submitted to the test on July 22 after Bridges had warned her that the court could hold her in contempt, and she tested negative. Bridges said that DHS had been trying to obtain a hair-follicle test from Shelton prior to the court's ordering the test, and Shelton had been warned not to dye her hair before submitting to the test. Despite having been told not to, Bridges said that Shelton had dyed her hair before taking the test. Dunn did not report for his test as ordered, was later told that he did not have enough hair to test, and had failed to return for a second attempt.

Bridges testified that on the day LD was taken into custody, July 17, 2019, Shelton was arrested for possession of methamphetamine, and she later pleaded guilty to that charge. She was arrested again in August 2019 and was incarcerated until October 2019. Shelton was incarcerated again in November 2019 and released February 5, 2020. Stable housing had been a problem prior to LD's removal, but the parents were currently residing in a suitable home. However, they planned to move into a trailer on property they owned after

3

making some repairs to the trailer. Bridges said that since the last court hearing, Shelton had complied with the order to participate in individual counseling, but Dunn had gone to only one appointment. Bridges said that no additional services could be offered to achieve reunification because services had been offered since 2018, and the parents were still unable to progress to unsupervised visitation. When questioned about the potential harm of returning LD, Bridges cited the parents' noncompliance with the case plan and court orders and the fact that their continued drug use was "unknown." An adoption specialist testified that there were no barriers to adoption for LD.

Shelton testified that she had been working hard since the last court date to correct her mistakes. She had been employed since late June, and since the last court hearing, she had been going to counseling regularly and submitting to drug screens. She said that she had been participating in a recovery program at her church as well as other church activities; had recently had her driver's license reinstated; had bought a vehicle; and had bought a piece of property they planned to move to after repairing their trailer. Shelton said that the delay in getting her hair-follicle test was because she wanted to speak to her attorney first. She said that she had dyed her hair before the court hearing in which she was ordered to do the test. Shelton said that she understood that it was a problem if Dunn was using drugs even if she was not. Dunn denied that he has a drug problem, said that he had tested negative three days before the hearing, and said that he had been attending a church since July and participating in its recovery program.

Susan Tolin, the CASA volunteer for the case, testified that she had not submitted a full report because she lacked information regarding the parents' status and updates on their

drug testing. However, after hearing the evidence at the hearing, she testified that she did not feel it was in LD's best interest to be returned to his parents at this time. She cited the lack of sufficient progress in drug testing, Dunn's failure to attend counseling, and insufficient housing.

The circuit court terminated both parents' parental rights upon finding that they had failed to remedy the conditions that caused removal, that LD had been subjected to aggravated circumstances, and that termination was in LD's best interest. The court noted the parents' failure to comply with drug-testing orders and that there was continued drug use by Dunn and "uncertainty" as to Shelton's continued drug use.

We review termination-of-parental-rights cases de novo. *Moore v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 87. At least one statutory ground must exist in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence. *Id.* Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Id.* The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Bratton v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 392, 586 S.W.3d 662. In resolving the clearly erroneous question, we give due regard to the opportunity of the circuit court to judge the credibility of witnesses. *Id.*

Shelton challenges only the court's best-interest determination. In order to terminate parental rights, a circuit court must find that termination is in the best interest of the child taking into consideration (1) the likelihood that the child will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. *Bratton, supra*. The circuit court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Id*. The potential-harm evidence must be viewed in a forward-looking manner and considered in broad terms. *Id*. Finally, a parent's past behavior is often a good indicator of future behavior and may be viewed as a predictor of likely potential harm should the child be returned to the parent's care and custody. *Id*.

Shelton argues that the circuit court erred in finding that termination was in LD's best interest because the court's basis for finding potential harm was speculative. She claims that the court's finding that there was "uncertainty" as to her drug use cannot be clear and convincing proof that termination was in LD's best interest. Shelton contends that her case is like *Ivers v. Arkansas Department of Human Services*, 98 Ark. App. 57, 67, 250 S.W.3d 279, 286 (2007), in which this court reversed a termination of the father's parental rights upon holding that there was no "conclusive evidence" that the father's failings from a prior case persisted and that he had shown "commendable resolve in seeking to remedy his drug problem." Shelton argues that, just as in *Ivers*, there was no "conclusive evidence" that her drug use persisted because she had passed her drug screens in the three months before the termination hearing and had passed the hair-follicle test. She argues that there was no evidence presented that dying one's hair impacts the test; that her testimony that she dyed

her hair prior to being ordered to submit to the test indicates that she was not trying to beat the test; and that if the court considered the test invalid, it should have ordered another test to remove the uncertainty.

We hold that *Ivers* is distinguishable. Ivers admitted having a drug problem at the beginning of the case and voluntarily entered inpatient treatment. He never tested positive for drugs during the case, and he was back in inpatient treatment at the time of the termination hearing, which was held approximately six months after the case began. In addition to noting Ivers's determination to remedy his drug problem, we noted that he had generally complied with every aspect of the case plan and that termination would not necessarily provide greater stability for the child due to a relative placement option being considered.

The uncertainties about Shelton's drug use resulted from her own failure to comply with the case plan and court orders. In the three months before the termination hearing, Shelton twice failed to submit to requested drug screens and tested positive for oxycodone without a prescription. Regarding the hair-follicle test, DHS presented testimony that it had previously requested that Shelton complete the test and had warned her not to dye her hair. At the termination hearing, the attorney ad litem argued that the court had confirmed with Shelton her availability to take the test following the July 6 hearing. Despite being court ordered to submit to the test that day, Shelton waited more than two weeks to submit to the test. Accordingly, while Shelton improved her compliance in the three months prior to the termination hearing, her continued evasiveness resulted in uncertainties about her drug use. Furthermore, Shelton was living with Dunn, who had recently tested positive for

7

methamphetamine, and she acknowledged that his continued drug use would be problematic.

We find that this case is more analogous to *Bratton*, *supra*. In that case, Bratton had twice failed to submit a sample for drug testing in the months before the termination hearing, had tested positive for oxycodone and failed to provide a prescription, had failed to attend a court-ordered hair-follicle test, continued to live with people who used illegal drugs, and had failed to address issues such as employment and transportation until mere months before the termination hearing. The supreme court has held that evidence that a parent begins to make improvement as termination becomes more imminent will not outweigh other evidence demonstrating a failure to comply and to remedy the situation that caused the children to be removed in the first place. *Camarillo-Cox v. Ark. Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005). Shelton failed to submit to drug screens for more than a year before LD was taken into custody, and she continued that pattern for a year after he had been taken into custody. She admitted that her compliance with drug testing and orders regarding maintaining employment and attending counseling regularly had all come in the last three months before the termination hearing. Given Shelton's long record of noncompliance and evasiveness, we hold that the circuit court's finding that termination was in LD's best interest was not clearly erroneous.

Affirmed.

WHITEAKER and VAUGHT, JJ., agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.
*Andrew Firth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.
*Dana McClain*, attorney ad litem for minor child.

8