Cite as 2025 Ark. App. 502

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CV-25-134

| | |
|---|---|
| DAKOTA CARLILE | Opinion Delivered October 22, 2025 |
| APPELLANT | |
| | APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT [NO.66FJV-23-112] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE LEIGH ZUERKER, JUDGE |
| APPELLEES | |
| | AFFIRMED |

**WAYMOND M. BROWN, Judge**

Appellant Dakota Carlile appeals the Sebastian County Circuit Court's order terminating his parental rights to his daughter, MC (DOB 09-24-22).[1] Appellant does not challenge the statutory ground for termination but rather argues that it was not in MC's best interest for his parental rights to be terminated since there was a less restrictive option to termination (guardianship). We affirm.

The Arkansas Department of Human Services (DHS) received a priority one referral through the hotline for "Neglect-Failure to Thrive" concerning MC on March 1, 2023, after she came to the Baptist Hospital emergency room dirty and with a cough. Although she was

---

[1]The circuit court also terminated the parental rights of MC's mother, Ashley Carlile, but she is not a party to this appeal.

five months old, she weighed only nine pounds. The aunt and uncle who brought MC to the hospital informed staff that Ashley was on drugs and had tried to sell MC, but when hospital personnel began questioning them, they left with MC before she was discharged. At that time, MC was believed to have pneumonia. Family Service Worker Lori Hamilton located the residence; however, Ashley's whereabouts were unknown. The aunt and uncle denied making the statements; they both tested positive for THC after submitting to drug screens. MC was subsequently removed from the residence.[2]

DHS filed a petition for dependency-neglect on March 3, outlining the above facts in an attached affidavit. The affidavit also noted that appellant was incarcerated in the Arkansas Division of Correction, Tucker Unit at that time.[3] The circuit court entered an ex parte order for emergency custody the same day.

A probable-cause hearing took place on March 9, and in the March 23 order, the circuit court found that an emergency existed making it necessary for DHS to remove the children from Ashley's custody and that those conditions still existed. The children were adjudicated dependent-neglected due to parental unfitness and neglect in an order filed on April 10. The order noted that appellant and MB's father were nonoffending parents; however, it found appellant unfit for custody or placement. MC's case goal was set as

---

[2]MC's older brother, MB, was also removed from his father's residence because the father did not know if he had legal custody of the child; however, the case was closed, and MB was placed with his father.

[3]Appellant was married to Ashley at the time of MC's conception, so he is her legal father.

reunification with a concurrent goal of adoption.  The circuit court also ordered DHS to hold a staffing to address visitation for appellant.  A review hearing took place on November 30.  In the order entered on January 17, 2024, the circuit court found that MC should remain in DHS's custody.  By this time, appellant was receiving Zoom visitation with MC.

The permanency-planning hearing took place on February 29.  In the March 25 order, the circuit court found that MC's case goal should be adoption following termination of parental rights because the parents had not made significant, measurable progress on the case plan and were not in compliance with court orders.  The circuit court noted that appellant was serving a twenty-year sentence at the Tucker Unit.

A review hearing took place on August 1.  In the September 3 order, the circuit court kept the case's primary goal as adoption following the termination of parental rights but added a concurrent goal of guardianship.

DHS filed a petition for termination of parental rights on August 9 alleging four grounds for termination of appellant's parental rights: (1) twelve-month failure to remedy, (2) subsequent other factors, (3) sentenced in a criminal proceeding for a period of time that would constitute a substantial period of MC's life, and (4) aggravated circumstances.

The termination hearing took place on November 7.  Sharon Cole testified that she is currently the DHS family caseworker, having assumed that role in May 2023.  She stated that at the time of removal, DHS had no prior history or involvement with the family. She said that appellant was already incarcerated at the time of removal.  She stated that MC had been out of Ashley's custody for twenty months but that appellant visited MC regularly via

3

Zoom. She testified that appellant told her he anticipated going up for parole in 2025; however, she acknowledged that the date could have changed. She stated that appellant had been out of MC's life the entire time and that he was expected to continue to be out of MC's life for an extended period. She opined that neither parent had an emotional bond to MC. Cole stated that MC is adoptable and that there are over three hundred matches for her. She also said that MC's foster parents wished to adopt her. She testified that MC had been in this same placement since removal. She stated that MC's foster mother, Anjenette Otts, is appellant's stepsister. According to Cole, Otts is not interested in a guardianship. She stated that it was in MC's best interest to have both parents' parental rights terminated. She admitted that no one had investigated appellant's sister, Tiffany Jones,[4] as an option for guardianship.

Appellant testified that he has a lengthy criminal history. He stated that he should be able to come up for parole sometime in early 2025; however, he also admitted that time could be pushed back for bad behavior. He said that he does not currently participate in work release or otherwise earn an income. Appellant acknowledged that due to his current situation, he could not provide a roof or stability for MC. He stated that he did not want his parental rights to MC to be terminated. He testified that he had been incarcerated since December 2019, but he was able to take a furlough and see MC while she was in the NICU

---

[4]Jones filed a motion to intervene for the purpose of seeking guardianship; however, she subsequently filed a motion asking that her motion be withdrawn, which was granted by the circuit court.

4

in Mercy Hospital after she was born. When asked about the seven major guilty disciplinary violations he had received since January 2024, appellant replied that the prison was wrong on some of them. Appellant stated that he wanted a guardianship in place so that MC could get to know him and know that he is her father. He said that he believes he is MC's biological father but admitted that he does have some doubts.

Jones testified that she is appellant's sister and that MC had been removed from her house. She admitted that she was the one who took MC to the hospital on March 1, 2023. She stated that she informed DHS that she wanted to be considered a placement for MC, but it never happened. She said that she told appellant she would be MC's guardian, so she had her attorney file a motion to intervene. She stated that she agreed to withdraw the motion because her attorney told her that it "might be a very long shot." She testified that she still would like to be considered for guardianship. She said that MC and Ashley had moved in with her around Thanksgiving 2022.

Otts testified that she and her husband, Nick, are MC's foster parents. She stated that appellant is her former stepbrother, but she still considers him her brother. She said that MC is thriving and growing. She testified that Ashley and MC came to live with her on October 31, 2022, once MC was discharged from NICU. She stated that they lived with her through most of November and that the children enjoyed Christmas at her house. She said that Jones called her after MC was removed, asking for supplies from her home so that Jones could prove to DHS that Jones had a stable room for MC. She stated that she subsequently contacted DHS and informed them that she was interested in getting MC placed with her

5

because she still had all the belongings that she had previously purchased for MC. She said that MC was placed with her the same night. She stated that she did not know MC was living with Jones until February 2023. She testified that she and Nick want to adopt MC so that MC can have permanency. She stated that she would allow MC to have a relationship with appellant if she adopts MC.

DHS asked the circuit court to grant its petition based on the grounds pled. Appellant's attorney asked the circuit court to deny the petition and, instead, grant a guardianship in favor of the Otts. The attorney ad litem asked the circuit court to grant the petition to terminate parental rights as to both parents. The circuit court terminated appellant's parental rights on the ground that he had been sentenced in a criminal proceeding to a substantial period of MC's life. The termination order was filed on December 17, 2024. The circuit court found that it was in MC's best interest to terminate the parents' parental rights, that MC is adoptable, and that she could face potential harm if returned to either parent. When terminating appellant's parental rights, the court found the following:

> c. **A.C.A. § 9-27-341(b)(3)(B)(iii) That a parent is sentenced in a criminal proceeding for a period of time that would constitute a substantial period of the juvenile's life**.
>
> The Court notes that from the beginning of this case in March, 2023 through the present, the juvenile's father, Dakota Carlile, has been incarcerated in the Arkansas Department of Corrections due to his conviction upon serious felony charges. He is serving a twenty year sentence (240 months) which was imposed upon him per sentencing order entered on January 2, 2020 by the Sebastian County, Arkansas Circuit Court in Case nos. CR-2019-613-A-F & CR-2019-1021-A-F, regarding multiple serious criminal counts. Based upon the circumstances, it is

6

obvious that Mr. Carlile does not presently have stable housing, income/employment or transportation as would be necessary in order to have placement of the juvenile. He has neither a vehicle nor a valid driver's license at this time. The Court notes from the documentary evidence that he has completed some services as have been available to him through the Arkansas Department of Correction – specifically, including Parenting classes, Thinking Errors classes, Communication Skills classes, and Stress Management classes. The Court also notes that Mr. Carlile has visited by Zoom from the prison facility when visitation has been offered.

But the Court finds that the ongoing and continuing incarceration of the father, Mr. Carlile, has already constituted and will continue to constitute a substantial period of the life of the juvenile, who was born on September 4, 2022. The father has been out of the juvenile's life since the time she was born, and has had very little relationship with or attachment to her. Accordingly, the Court finds that the Department has proven that it is entitled to terminate the rights of the parent, Dakota Carlile, upon the ground that the parent has been sentenced in a criminal proceeding for a period of time that would constitute a substantial period of the juvenile's life.

Appellant filed a timely notice of appeal on December 23.

We review termination-of-parental-rights cases de novo.[5] At least one statutory ground must exist, in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence.[6] In making a "best interest" determination, the circuit court is required to consider two factors: (1) the likelihood that the child will be adopted and (2) the potential of harm to the child if custody is returned to a parent.[7] The potential harm to the child is a factor to be considered, but a specific potential

---

[5]*Roland v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 333, 552 S.W.3d 443.

[6]Ark. Code Ann. § 9-27-341(b)(3)(A), (B) (Supp. 2021).

[7]*Ware v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 480, 503 S.W.3d 874.

harm does not have to be identified or proved by clear and convincing evidence.[8] The potential-harm analysis is to be conducted in broad terms.[9] It is the "best interest" finding that must be supported by clear and convincing evidence.[10] We will not reverse a termination order unless the circuit court's findings are clearly erroneous.[11] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[12] Credibility determinations are left to the fact-finder.[13]

On appeal, appellant does not challenge the statutory ground but instead argues that termination was not in MC's best interest where there was a less restrictive alternative such as guardianship that would preserve the family unit. Because appellant has not challenged the circuit court's decision as to the statutory ground for termination, we need not address it on appeal.[14]

---

[8]*Pine v. Ark. Dep't of Hum. Servs.*, 2010 Ark. App. 781, 379 S.W.3d 703.

[9]*Id.*

[10]*Singleton v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 455, 468 S.W.3d 809.

[11]*Fisher v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 39, 569 S.W.3d 886.

[12]*Id.*

[13]*Kerr v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 271, at 6, 493 S.W.3d 342, 346.

[14]*Fisher, supra.*

The State has an interest in finding a child an alternative permanent home when a parent cannot adequately provide one.[15] And displaced children have a concurrent interest in preserving relationships that serve their welfare and protection.[16] Moreover, the General Assembly has enacted the policy that relatives are preferred when placing children in permanent homes.[17] Our supreme court has made it clear that the statutory preference that a juvenile be placed with a relative applies at all stages of a dependency-neglect case.[18] However, this court has held that a circuit court is permitted to set termination as a goal even when a relative is available and requests custody.[19] This is because the Juvenile Code lists permanency goals in order of preference, prioritizing a plan for termination and adoption unless the juvenile is already being cared for by a relative, the relative has made a long-term commitment to the child, and termination of parental rights is not in the child's best interest.[20] Each termination-of-parental-rights case must be decided on a case-by-case basis.[21]

---

[15]Ark. Code Ann. §§ 9-27-341(c)(3), -360.

[16]*Clark v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 223, 575 S.W.3d 578.

[17]*See* Ark. Code Ann. § 9-28-105 (Repl. 2020); *Clark, supra*.

[18]*Ellis v. Ark. Dep't of Hum. Servs.*, 2016 Ark. 441, 505 S.W.3d 678; *see also* Ark. Code Ann. § 9-28-105.

[19]*Dominguez v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 2, 592 S.W.3d 723.

[20]*Id.*

[21]*Id.*

Appellant contends that the circuit court erred because it should have looked for ways to achieve permanency for MC through a less extreme remedy than termination, such as in *Ivers v. Arkansas Department of Human Services*,[22] and *Rhine v. Arkansas Department of Human Services*.[23] This is not a case, however, like *Ivers*, where the noncustodial parent demonstrated "commendable resolve in seeking to remedy his drug problem"[24] to achieve reunification because here, appellant's issue is not one of drug use that prevents reunification but his incarceration and twenty-year prison sentence. Nor is it like *Rhine*, which dealt with the circuit court's abuse of discretion in denying a motion for continuance so that the mother could sign a consent to the termination of parental rights.

The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective.[25] At the time of the termination hearing, MC had been in the Ottses' temporary custody for at least twenty months, and appellant was still incarcerated. MC needed permanency, and the court found that the only way she could obtain the permanency she needed was by terminating

---

[22]98 Ark. App. 57, 250 S.W.3d 279 (2007).

[23]101 Ark. App. 370, 278 S.W.3d 118 (2008).

[24]*Ivers*, 98 Ark. App. at 67, 250 S.W.3d at 286.

[25]Ark. Code Ann. § 9-27-341(a)(3).

appellant's parental rights. We cannot say that the court erred by terminating appellant's parental rights instead of placing MC in a guardianship. The Otts wanted to adopt MC, not be her guardians. And evidence showed that MC had thrived while in the Ottses' custody. Even though appellant contended that he would be paroled in early 2025, the evidence showed that he had an extensive criminal history and had been sentenced to twenty years' imprisonment for various crimes. Additionally, there was no real bond between appellant and MC because appellant had spent MC's entire life in prison, and their only connection was via Zoom once or twice a month. Because appellant was incarcerated, he could not even provide for MC's basic needs. Thus, there are no grounds for us to hold that the court made a mistake in finding that terminating appellant's parental rights was in MC's best interest.

Affirmed.

KLAPPENBACH, C.J., and HARRISON, J., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for appellant.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.